Mitchell DROBBIN,
Intervening-Plaintiff,

v.

NICOLET INSTRUMENT CORPORATION, Barry Kass, William Stewart, Keith Brue, Robert Penrod, Russell B. Cichy and Braintech, Inc., Defendants.

BRAINTECH, INC. and Nicolet Instrument Corporation, Plaintiffs,

v.

James C. COURI and Poseidon Capital Corp., Defendants.

POSEIDON CAPITAL CORP., Counterclaim Plaintiff,

v.

NICOLET INSTRUMENT CORPORATION, and Braintech, Inc., Counterclaim Defendants,

and

Barry Kass, William Stewart, John B. Krauss, Keith Brue, Robert Penrod, and Russell Cichy, Additional Counterclaim Defendants.

Nos. 85 Civ. 6118–CSH, 85 Civ. 6151–CSH.

United States District Court, S.D. New York.

Feb. 21, 1986.

Baer Marks & Upham, New York City (Barry J. Mandel and Deborah R. Linfield, of counsel), for Braintech, Inc.

Weil, Gotshal & Manges, New York City (Dennis J. Block, Joseph S. Allerhand and Myrna S. Levine, of counsel), for Nicolet Instrument Corp.

Skadden, Arps, Slate, Meagher & Flom, New York City (Peggy L. Kerr, Stephen M. Axinn and Jane Bello Burke, of counsel), for Poseidon Capital Corp. and James C. Couri.

Lowey, Dannenberg & Knapp, P.C., New York City (Stephen Lowey and Richard Bemporad, of counsel), for Mitchell Drobbin.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

These actions are brought under the federal securities laws. State statutory and common law claims are also asserted by pendent jurisdiction. In addition, it appears that subject matter jurisdiction derived from diversity of citizenship exists.

The litigation represents, in essence, efforts by competing interests to obtain control of a corporation which owns, or is the exclusive licensee, of patents covering medical diagnostic devices. The case is before the Court on cross-motions for preliminary injunctions. Following extensive discovery and an evidentiary hearing, the Court propounds the following findings of fact and conclusions of law. Rule 65, F.R. Civ.P.

### I.

*The Parties*

Braintech, Inc. ("Braintech") is a publicly-held Nevada corporation. It owns or holds exclusive licenses to patents covering the technology which is described under Point II, *infra.*

Nicolet Instrument Corporation ("Nicolet") is a large, publicly-owned Wisconsin corporation whose shares are traded on the New York Stock Exchange. Nicolet manufactures and markets a broad range of technological instrumentation, including biomedical research and diagnostic equipment.

Poseidon Capital Corporation ("Poseidon") is a privately-held New York corporation. James C. Couri is the president of Poseidon.

William Stewart and Barry Kass have been, since the inception of Braintech in 1980 or shortly thereafter, officers of Braintech. They currently serve on the Braintech board of directors.

Keith Brue, Robert Penrod, and Russell B. Cichy are officers or employees of Nicolet who currently serve on the board of directors of Braintech. Together with Stewart and Kass, these three individuals make up the entire five-man board of Braintech.

John B. Krauss is the president of Nicolet.

Mitchell Drobbin is a public shareholder of Braintech, who has intervened in the litigation under circumstances to be related *infra.*

## II.

### The Technology

This litigation is concerned with five patents on a device for scanning the human brain and diagnosing brain dysfunction. The device is known as the Brain Electrical Activity Mapping, or "BEAM," system. The device is the joint invention of Frank H. Duffy, M.D., a physician, and N. David Culver, a computer engineer and consultant. Duffy and Culver formed Braintech in December 1980 for the purpose of manufacturing and marketing the BEAM system. Of the five patents which protect the device, Braintech owns two of them directly, and holds exclusive licenses on the other three. Those three patents are owned by the Boston Children's Hospital. Duffy was affiliated with Children's Hospital at the time he and Culver founded Braintech.

The initial intended use of the BEAM technology was to furnish a more sophisticated diagnostic tool for neurological conditions. As a medical witness explained it, the currently existing electroencephalogram ("EEG") can detect relatively gross brain wave disorders; but an EEG tracing of less marked abnormalities can cause ten neurologists to give ten different diagnoses. The BEAM system, combining electronic and computer technologies, is a superior neurological diagnostic device. There is in addition some medical evidence for the proposition that the technology may be valuable in non-neurological medical fields as well.

## III.

### Summary of the Litigation

As Judge Kaufman had occasion to write in *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 258 (2d Cir.1984):

"Contests for corporate control have become ever more frequent phenomena on the American business scene.... Skirmishes are fought in company boardrooms, in shareholders' meetings, and, with increasing regularity, in the courts."

The court skirmishes in the cases at bar are fought over control of Braintech and its technology.

Poseidon fired the opening broadside on August 3, 1985 when it filed a complaint in this Court against Nicolet, Braintech, Stewart, Kass, Brue, Krauss, and two individuals who are no longer parties: Lauress V. Ackman and David Granquist, who were at the pertinent times and remain today officers of or affiliated with Nicolet. 85 Civ. 6118. I will summarize the 30-page, 70-paragraph complaint.

Poseidon alleged it is a shareholder of Braintech. It acquired its initial Braintech shares in consequence of a May 31, 1985 written agreement in which Braintech authorized Poseidon to restructure its debt, negotiate a merger, consolidation, or sale

of assets and/or to obtain debt or equity financing, and to provide other services. Other shares were acquired in circumstances to be related. Poseidon complained of subsequent dealings between Nicolet and the Braintech board of directors which culminated in a July 31, 1985 written agreement between Braintech and Nicolet. That agreement resulted in the sale of Braintech shares to Nicolet, and contemplated subsequent agreements whereby Braintech would sell assets and license technology to Nicolet.

Poseidon asserted derivative claims on behalf of all Braintech shareholders, as follows:

*First claim:* Poseidon alleged that Nicolet, Kass, Stewart, Granquist, Krauss and Brue, in their conduct of the Nicolet/Braintech negotiations and transactions, breached fiduciary duties owing to Braintech shareholders.

*Second claim:* Poseidon alleged against all defendants the inevitable "civil RICO" cause of action, 18 U.S.C. § 1961. The predicate criminal acts are alleged to be violation of a New Jersey bribery statute, and the federal mail and wire fraud statutes.

*Third claim:* Poseidon alleged that all defendants violated the disclosure requirements of section 13(d)(1) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78m(d).

Poseidon prayed for an order removing Brue, Kass and Stewart from Braintech's board, enjoining the consummation of further transactions between Nicolet and Braintech, and enjoining the issuance by Braintech of any additional shares of common stock, warrants or options.

Braintech and Nicolet responded on August 7, 1985 with a complaint against Couri and Poseidon. 85 Civ. 6151. They filed an amended complaint on September 5. That 66-page, 153-paragraph pleading asserted five claims:

*First claim:* Violations by Couri and Poseidon of the disclosure requirements of section 14(f) of the 1934 act, 15 U.S.C. § 78n(f), and SEC Rule 14f–1, in connection with Couri's and Poseidon's assumption of control of Braintech in May-July, 1985.

*Second claim:* Violations by Couri and Poseidon of section 10(b) of the 1934 act and Rule 10b–5 in connection with defendants' relations with Braintech.

*Third claim:* Violations by Couri and Poseidon of section 13(d) of the 1934 act.

*Fourth claim:* Civil RICO.

*Fifth claim:* Violations by Couri and Poseidon of sections 78.210 and 78.270 of the Nevada Revised Statutes (Braintech being a Nevada corporation) in respect of the issuance of 4.5 million shares of Braintech stock to Poseidon on July 14, 1985.

*Sixth claim:* Breaches by Couri "and his designees" of common law fiduciary duties owing to Braintech's shareholders, including Nicolet, at a time when Couri and his designees were controlling Braintech's affairs.

*Seventh claim:* Violation by Couri of section 78.140 of the Nevada Revised Statutes in respect of transactions between Braintech and Poseidon which Couri caused the Braintech board to approve.

*Eighth claim:* Common law fraud in respect of Poseidon's acquisition of Braintech shares.

*Ninth claim:* In the alternative, breaches by Poseidon and Couri of contracts entered into with Braintech.

Braintech and Nicolet prayed for judgment declaring null and void all issuances of stock and all options, warrants and other rights to acquire stock granted by Braintech to Poseidon and Couri during the relevant periods of time; declaring null and void certain agreements between Braintech and Poseidon; and enjoining Couri and Poseidon from acting in furtherance of those agreements, exercising voting rights in Braintech shares, acquiring additional Braintech shares, transferring those shares, warrants or options which they held, and engaging in proxy solicitation of Braintech shareholders.

On October 3, 1985 Drobbin intervened in 85 Civ. 6188 to assert claims against Nicolet, Kass, Stewart, Brue, Penrod, Cichy and Braintech. Drobbin identified himself as a Braintech shareholder. He styled his intervenor's complaint as a stockholders' derivative action. Drobbin alleged, in respect of events beginning in late July 1985 and extending through September, the breach by Kass and Stewart of fiduciary duties which they owed as Braintech directors to Braintech and its public shareholders. Drobbin also charged Nicolet, as controlling shareholder of Braintech during that period, with violation of its fiduciary duties to Braintech and its public shareholders. Drobbin prayed that the issuance to Nicolet of certain Braintech shares and warrants be declared null and void; that an asset purchase agreement and a license agreement between Nicolet and Braintech also be declared null and void; and that a court-supervised receiver be appointed to manage Braintech's affairs.

Braintech and Nicolet moved to dismiss the derivative action brought by Poseidon. I granted that motion for reasons stated on the record and not repeated here. Couri and Poseidon thereafter filed an amended and supplemental answer and Poseidon filed counterclaims in the action commenced against them by Braintech and Nicolet. The counterclaims are as follows:

*First claim:* Violations of section 14(f) of the 1934 act in respect of an election of Braintech directors on July 30, 1985.

*Second claim:* Violation of section 14(f) in respect of a section 14(f) report subsequently filed by Braintech on August 29.

*Third claim:* Violation of section 13(d) in respect of Nicolet's June 17, 1985 section 13(d) filing, and subsequently.

*Fourth claim:* Violations of section 10(b) and Rule 10b-5 in respect of Nicolet's acquisitions of Braintech shares.

*Fifth claim:* Breach by Braintech and its board of section 78.140 of the Nevada Revised Statutes in respect of agreements entered into between Braintech and Nicolet in late July 1985 and thereafter.

*Sixth claim:* Breach of a consulting agreement dated July 11, 1985 entered into between Poseidon and Braintech.

*Seventh claim:* Anticipatory breach of a July 22, 1985 agreement entered into between Poseidon and Braintech.

*Eighth claim:* Tortious interference by Nicolet with a May 31, 1985 agreement entered into between Braintech and Poseidon.

*Ninth claim:* Fraudulent inducement by Kass and Stewart (who together with Krauss, Brue, Penrod and Cichy had been added as additional counterclaim defendants) of the May 31, 1985 agreement between Poseidon and Braintech.

On its counterclaims, Poseidon prayed to enjoin Nicolet from acquiring or disposing of any assets or voting securities of Braintech, from soliciting proxies from other Braintech shareholders, and from influencing or controlling the management of Braintech. Poseidon further prayed that Nicolet be divested of its purchases of Braintech shares; that proper disclosures be made; and that a stock purchase agreement, a stock option agreement, a license agreement, and an asset purchase agreement entered into between Braintech and Nicolet be declared null and void.

In addition to the injunctive remedies sought by the parties against each other, as summarized *supra,* the complaints and counterclaims contain demands for money damages.

The case came on for hearing before the Court on cross-motions for preliminary injunctions. Poseidon asked that, within the context of a shareholders' meeting to be held to vote upon the asset purchase agreement between Braintech and Nicolet, Nicolet be denied the right to vote its Braintech shares, or be required to vote them *pari passu* with the votes cast by public shareholders at the meeting.

Braintech and Nicolet asked that Couri and Poseidon be restrained from transferring any Braintech shares they hold to others.

At the beginning of the hearing on these applications for preliminary injunctions, the Court ordered the trial of the actions on their merits, insofar as they sought equitable relief, to be advanced and consolidated with the hearing of the applications. Rule 65(a)(2), F.R.Civ.P. The hearings extended over three weeks, generating 2,000 pages of transcript and almost 200 exhibits. The summations of counsel and post-hearing memoranda request broad equitable relief. Poseidon now contends that all of Nicolet's Braintech shares should be returned to the Braintech treasury, and all agreements between Braintech and Nicolet be declared null and void. Nicolet and Braintech contend that all of Poseidon's and Couri's Braintech shares should be returned to the Braintech treasury, and all agreements between Braintech, Poseidon and Couri be declared null and void. Intervenor Drobbin makes common cause with Poseidon against Nicolet and Braintech, and prays for the appointment of a receiver over Braintech's affairs.

## IV.

*Undisputed Facts*

Many factual aspects of the case are in dispute. Primarily they relate to inferences to be drawn, and characterizations to be made. But many significant facts are undisputed. It is useful to set certain of them forth now, in order to narrow the issues and furnish the background against which the disputes must be resolved.

### (A) *The Genesis of Braintech*

The BEAM inventors, Duffy and Culver, formed Braintech in December 1980. Stewart joined the corporation in December 1982 as a director and vice president in charge of operations. Kass became a director, vice president, and eventually president of Braintech.

While Braintech has certain other assets, it is common ground that the BEAM technology is by far its most valuable. However, Braintech has been singularly unsuccessful in marketing this apparently promising device.

With the assistance of its investment advisor, Muller & Company, Braintech first offered its stock to the public in October 1983. The offering price was $5 per unit, each unit consisting of four shares and a warrant. That offering raised several million dollars. However, by the spring of 1985, Braintech was *in extremis.* It had spent the funds raised by the 1983 public offering. It had accumulated debts in excess of $1 million. Braintech's work force had shrunk from a previous high of 28 employees to three: Kass, the president; Stewart, the vice president; and Suzette Stewart, Stewart's daughter, who was employed as an administrator, secretary and bookkeeper. Duffy and Culver remained the major shareholders of Braintech, but held no offices in the corporation. None of the three employees had been paid any salary since September of 1984.

During 1983 and 1984, Braintech actively solicited, and proclaimed itself eager to receive, overtures of any feasible kind from other companies. No acceptable offers were received. Some witnesses suggested that Culver, then active in Braintech's affairs, put off potential suitors with an abrasive manner. For whatever reason, it is apparent that Braintech made strenuous efforts to attract the interest (and the funds) of others, to no avail.

To be sure, Nicolet had demonstrated interest in Braintech and the BEAM technology. Nicolet management made overtures to Culver and to the corporation in June 1984 and again in December 1984. But Braintech rejected as unsatisfactory Nicolet's suggestions: that Nicolet's sales force sell the BEAM technology (June 1984 proposal), or that Nicolet acquire all of Braintech's shares (December 1984 proposal). Those in charge of Braintech rejected the purchase price contained in the latter proposal as insufficient in amount.

As of spring 1985, Braintech had placed only eight of its machines "in the field." Even as to these, the corporation was encountering difficulties in realizing revenues

from them. Other Braintech machines were in inventory, with no immediate sales prospects at an asking price in excess of $600,000 each. The company was, in a phrase suggested by the Court and adopted by counsel, "brain dead."

These were the circumstances when Couri and his corporation, Poseidon, were introduced to Braintech.

### (B) *The Advent of Couri and Poseidon*

Poseidon was incorporated in October 1984. Couri is the president. Poseidon's principal business is described as "investments and management consultancy." Poseidon has not to date filed a tax return, or prepared a financial statement. It has no payroll or telephone number. Poseidon's mailing address is that of Howard Krantz, an attorney who has represented Couri in unrelated matters, and is a close personal friend.

Poseidon has three shareholders: Krantz; one Tompkins (of whom the evidence reveals nothing else); and CTC Venture, a sole proprietorship owned by Couri's wife Carla, whose general power of attorney Couri holds. At one time pertinent to this litigation, Couri's brother John was a Poseidon shareholder. He is no longer. It is common ground that Couri controls Poseidon; and that (save for certain Braintech shares here at issue) Poseidon has no assets.

It has become equally apparent during discovery and trial that Couri has no personal assets. On the contrary, he has a sizably negative net worth, as the result of an absence of assets and the presence of judgments against him and other indebtedness.

Couri has a checkered past. He has twice pleaded guilty in this Court to charges of fraud. One charge involved securities fraud. The other involved fraudulent statements made to a bank in connection with an art gallery Couri controlled. Couri is the subject of an injunction against securities laws violations obtained by the Securities and Exchange Commission.

In April 1985, Couri formed a casual acquaintance with one Alex Lucas, an employee of Muller & Company. Muller, after taking Braintech public in 1983, had entered into a financial consulting agreement with Braintech. Pursuant to that agreement, Muller was attempting without success to find investors for Braintech. In a series of social meetings, Couri impressed Lucas with his stature and management skills. Whether Couri revealed his past to Lucas, as Couri says, or concealed it and misled Lucas about his present circumstances, as Lucas says, I need not decide for reasons I will discuss *infra*. But there is no question that Lucas regarded Couri as a potential investor and source of assistance to Braintech. In consequence, on May 4, 1985 Lucas took Couri out to the Braintech offices in South Plainfield, New Jersey for a meeting.

Attending that meeting were Lucas, Couri, Kass, Stewart and one Martin J. Kaplitt, M.D. Dr. Kaplitt, a practicing physician, is also president of Advanced Medical Imaging Corp. ("AMIC"), a company involved in medical technology. Kaplitt was also considering Braintech as a possible investment; his presence at the Braintech offices on the same day as Couri was coincidental. Both Couri and Kaplitt listened to a presentation of the BEAM technology by Dr. Duffy. Kaplitt could understand that presentation better than Couri. Kass and Stewart then described Braintech's current financial condition. Everyone could understand that.

The Braintech people were looking for an investment of some $500,000. Couri stated that in the company's condition, such an amount would simply vanish into the hands of the creditors. Couri added that he was not interested in investing any amount. However, he gave a preliminary description of how Braintech's debt might be restructured and the company restored to financial health. His discourse apparently impressed Kass and Stewart, as well as Dr. Kaplitt, who stated to Couri as they left Braintech that he might be interested in talking to Couri again.

Following that initial meeting, Couri, Kass and Stewart held discussions concerning Couri's suggestion that Poseidon might render investment and management advice to Braintech. These discussions also involved Kenneth M. Socha, an attorney who was secretary and counsel of Braintech. After passing through a draft dated May 28, 1985, these discussions culminated in a letter agreement dated May 31, 1985. This is the first significant document in the case. It involves three parties: Braintech, Poseidon, and AMIC. Kass, Stewart and Socha signed for Braintech; Couri signed for Poseidon; and Kaplitt signed for AMIC.

The May 31, 1985 letter agreement, together with other pertinent documents, have been analyzed, debated, testified to and argued about as if they were among the Dead Sea Scrolls. In point of fact, the salient features are relatively straightforward. In the case of the May 31, 1985 Braintech/Poseidon/AMIC letter agreement (the "May 31 agreement"), they are these:

* The purpose of Poseidon's and AMIC's intervention in Braintech's affairs was described as "restructuring its debt, negotiating a potential merger, consolidation, sale of assets, etc. and/or in obtaining additional debt and equity financing ..."

* During the next 90 days Poseidon was authorized to contact Braintech's creditors and try to work out satisfactory arrangements; to negotiate on Braintech's behalf "any potential merger, acquisition, consolidation, sale of assets, business combination, joint venture or licensing agreement or similar agreement"; and to liquidate Braintech's existing inventory and realize any receivables.

* 300,000 shares of common stock of Braintech were to be issued to Poseidon for entering into the May 31 agreement, those shares not being contingent "upon Poseidon's performance hereunder or otherwise."

* Upon execution of the May 31 agreement, Poseidon and AMIC obtained the right to designate a majority of Braintech's board of directors.

* When and if Poseidon and AMIC were satisfied with arrangements Poseidon had made with Braintech's creditors, Poseidon and AMIC could each invest $250,000 in Braintech, in exchange for an additional 1.5 million shares each of Braintech common stock and notes secured by Braintech's assets; in the event AMIC failed to make the investment, Poseidon could fund the entire $500,000 investment in exchange for 3,000,000 shares and notes aggregating $250,000.

* Upon the investment of $250,000 and after Poseidon made arrangements with Braintech's creditors, Poseidon would receive an additional 300,000 shares of Braintech common stock.

* Poseidon and AMIC each received options to purchase an additional 1,000,000 shares of Braintech common stock (at prices ranging from 15¢ to 30¢ a share), in exchange for a $10,000 loan to enable Braintech to "pay its most pressing obligations" (to be disbursed at the discretion of AMIC and Poseidon).

Upon execution of the May 31 agreement, Poseidon and AMIC designated Krantz and Dr. Kaplitt as two of Braintech's three directors. Coming into the May 31, 1985 meeting of the Braintech board, Kass and Stewart were the only two directors. Kass withdrew. Krantz and Kaplitt joined the board. Stewart remained.

### (C) *The Coming Again of Nicolet*

Although its initial overtures had been rebuffed, Nicolet's interest in Braintech continued. Nicolet got word of the intervention of Poseidon and Couri. That prompted a mailgram on May 29, 1985 from Krauss, the president of Nicolet, to one Raymond Tsao, then a director of Braintech (Tsao resigned as a director the following day). Krauss's mailgram read:

"THIS WILL CONFIRM NICOLET'S INTENT TO NEGOTIATE THE ACQUISITION OF THE OUTSTANDING SHARES OF BRAINTECH INC. AS WE

HAVE DISCUSSED. WE WISH TO MEET WITH YOU AT THE EARLIEST MOMENT FOR THIS PURPOSE."

The drama that unfolded from June through August 1985, while involving certain subplots, alarums and excursions, has to do primarily with Nicolet's renewed efforts to get control of Braintech and its technology, the resistance of Poseidon and Couri to those efforts, and the reactions of Kass and Stewart as the tides of battle ebbed and flowed.

(D) *The Guns of June through August: Negotiation, Maneuver, Disillusion, Strife, and the Exodus of Poseidon and Couri*

I am prepared to accept that in the days immediately following execution of the May 31 agreement, Couri made contact with a number of Braintech's creditors. The value of those services, if any, is hotly debated, and will be addressed *infra.* For the present, it is sufficient to say that Braintech and Nicolet argue that no significant debts were restructured; Couri contends that no creditors actually filed suit against Braintech during his tenure. Both assertions appear to be correct.

The focus of events fell not so much upon efforts to restructure Braintech's debt as it did upon Nicolet's renewed interest in Braintech. Following up on Nicolet's May 29th mailgram, a Nicolet delegation came to New York to discuss further overtures with Braintech on June 4, 1985. The meeting took place at the offices of Baker & MacKenzie, counsel for Poseidon. Couri headed up the Braintech negotiating team, consistent with the authority conferred upon him by the May 31 agreement.

Duffy and Culver attended that meeting. At that time, Duffy and Culver together owned 8,089,000 shares of Braintech common stock, representing 58.77% of the then outstanding shares of the company. The Nicolet representatives expressed a desire to confer privately with Duffy and Culver. Couri made no objection, and of course there was no basis upon which he could have done so. A conference room at Baker & MacKenzie was made available for the purpose. Ultimately Duffy and Culver granted Nicolet options to purchase all Braintech shares beneficially owned by Duffy and Culver, exercisable until July 19, 1985.

On June 14 the 300,000 Braintech shares beneficially owned by Poseidon upon execution of the May 31 agreement were formally issued to Poseidon.

By June 26, 1985 the Braintech-Nicolet negotiations had advanced to the point where, on that date, those parties executed a non-binding letter of intent. The June 26 letter recites that its purpose:

"... is to state the intentions of Braintech, Inc. ('Braintech') and Nicolet Instrument Corporation ('Nicolet') with respect to the acquisition by Nicolet of substantially all of the assets and business of Braintech."

Among others, the following steps were contemplated:

* Nicolet would exercise the Duffy/Culver options, and then acquire certain of the assets and liabilities of Braintech, including the exclusive right to Braintech's BEAM technology.

* Poseidon and AMIC would cancel the options granted to them under the May 31, 1985 agreement, and AMIC and Poseidon would pay $650,000 in cash for 4,500,000 Braintech shares.

* Nicolet was to advance $100,000 to Braintech "as a good faith deposit," to be credited to amounts payable by Nicolet to Braintech if the transaction closed, and to be forfeited if it did not.

* In respect of Nicolet's purchase of Braintech's assets, the June 26 letter of intent specified the consideration that Nicolet would pay for Braintech's assets and its exclusive license. That consideration included a 5% royalty; prepayments of royalties in the amount of $1,000,000 on closing of the asset purchase agreement, $200,000 on August 1, 1989, and $300,000 on August 1, 1990, all nonrefundable; $445,000 in cash; options to purchase common shares of Nicolet at

stated times and prices; and a provision that 2,989,000 Braintech common stock would be contributed to Braintech's treasury, which would leave Nicolet with a total of 5,100,000 shares of Braintech common stock.

This June 26 non-binding letter of intent was signed by Kass as president of Braintech and by Krauss as president of Nicolet.

Nicolet promptly made the $100,000 good faith deposit, forwarding it to Baker & MacKenzie, counsel for Poseidon, at Braintech's instructions, where it was placed into one of several special accounts the law firm maintained for Poseidon/Braintech business.

Braintech convened a special meeting of its board of directors on June 27. Stewart, Krantz, and Kaplitt, the full board, attended. So did Socha, the secretary and counsel to Braintech; Kass, the president; Couri and Benedict Sciortino of Baker & MacKenzie, counsel to Poseidon. The meeting concerned implementation of the June 26 letter of intent with Nicolet. According to the minutes of the meeting, at p. 3, Couri indicated that Poseidon and AMIC "would be willing to make the investment contemplated by paragraph 4(b) of the corporation's Agreement in Principle with Nicolet" on certain terms and conditions. Before considering those terms and conditions, it is well to quote paragraph 4(b) of that agreement in principle in order to have in mind just what was contemplated. It read:

"As a condition to the parties' obligations, on or before the closing date, Braintech will have received documentation cancelling the option and related matters granted to Poseidon and AMIC, cash from them in the amount of $650,000 and in return will have issued 4,800,000 shares to them (plus the 300,000 shares already issued to Poseidon equal 5,100,000 shares)."

The terms and conditions which at the June 27 meeting Couri said were agreeable to Poseidon and AMIC were quite different. Poseidon was to receive an additional 300,000 Braintech shares "immediately ... in consideration of its services in negotiating the Agreement in Principle with Nicolet." In addition to that 300,000 shares, an aggregate of 4,500,000 shares would be issued by Braintech, 2,400,000 shares to Poseidon and 2,100,000 shares to AMIC. The consideration for those 4,500,000 shares would be the return of options previously issued to Poseidon and AMIC, and delivery of promissory notes (not cash) in the aggregate amount of $325,000 from each of Poseidon and AMIC. At the June 27 meeting, the Braintech board, comprised of Stewart, Krantz and Kaplitt, accepted these conditions, and also resolved to issue warrants to Poseidon covering the right to purchase up to 1,000,000 additional shares of Braintech common stock at 18¢ per share.

At the June 27 meeting the Braintech board also resolved that after the next meeting of the Braintech shareholders, Poseidon and Couri would be retained under a consulting agreement to provide management services to Braintech at the rate of $100,000 per year for a two-year period, plus reimbursement of out-of-pocket expenses.

On July 9 AMIC and its president, Dr. Kaplitt, disappeared from the stage. Kaplitt explained in his testimony that the Braintech situation was simply becoming more complicated and time-consuming than he had anticipated. On July 9 AMIC assigned all its rights under the pertinent agreements to Poseidon; Kaplitt resigned from the Braintech board. Within the context of the June 26 letter of intent between Braintech and Nicolet (as amended by the events of the June 27 Braintech board meeting), this left Poseidon entitled to receive 4.5 million Braintech shares in consideration of a $650,000 promissory note.

About this time it came to Couri's attention that Nevada law (which governed Braintech's affairs) requires that at least the par value of shares be paid for in cash or services rendered at the time of issuance. Nev.Rev.Stat. § 78.210 and § 78.270. The par value of Braintech's shares was one cent. Accordingly, Poseidon was

required to pay at least $45,000 in cash or services upon the issuance of the 4.5 million Braintech shares which the Braintech board had authorized at the June 27 meeting.

These circumstances led to a meeting on July 11 at the Baker & MacKenzie offices. Couri and his counsel proposed to reduce the amount of Poseidon's note for the 4.5 million shares from $650,000 to $600,000, and to value Poseidon's "past services rendered" to Braintech at $50,000. In the view of the draftsmen, such alterations would bring the transaction into compliance with Nevada law. However, Stewart refused to accept these changes. He resigned from the Braintech board during an early morning telephone call to Couri on July 13.

On July 13, Krantz appointed Couri as a member of the Braintech board and its chairman. A special meeting was called for July 14 at the offices of Baker & MacKenzie. At that July 14 meeting (which was on a Sunday), Couri and Krantz elected Jerry Leibner as the third Braintech director. Nevada law requires a minimum of three corporate directors. Leibner was affiliated with Krantz in the practice of law.

Leibner did not attend the July 14 meeting. To the extent that he participated, that participation was by telephone.

According to the minutes of the July 14 meeting, the Braintech board (now consisting of Couri, Krantz, and Leibner on the end of a telephone line) valued certain of Poseidon's services to Braintech at $50,000. These were services which, Couri acknowledged, were limited to those rendered to Braintech during the period June 27 through July 14. (Tr. 208.) The board also authorized issuance to Poseidon of 4.5 million Braintech shares, in consideration of Poseidon's $50,000 in services, and:

"... a $600,000 note of Poseidon Capital Corp., which note is personally guaranteed by James C. Couri and Howard Krantz, Esq...."

That note was fully due upon closing of the Nicolet transaction; or, if that transac-

tion did not close on or before October 1, 1985, the principal became payable in installments of $81,250 on May 1, 1986 and quarterly thereafter.

The resolutions approved at the June 27 Braintech meeting, as reflected in the minutes, had obligated Braintech to deliver the 4.5 million shares to Poseidon and to AMIC in exchange for the promissory notes therein referred to, and:

"... upon delivery of evidence satisfactory to this Board of Directors that Poseidon and AMIC have sufficient net worth to insure payment in accordance with the terms of said notes or in lieu thereof personal guarantees of timely payment thereof...."

In point of fact, the Braintech board as it was constituted on July 14 accepted a Poseidon note and personal guarantees which are further described *infra*.

At the July 14 meeting the Braintech board also approved the immediate issuance of warrants to Poseidon to purchase an additional one million shares in Braintech at 18¢ a share, exercisable over a five-year period from the date of issuance.

Meanwhile, no progress was being made in arriving at a firm and binding agreement between Nicolet and Braintech (represented by Poseidon and Couri). The record abounds with cross-recriminations about why this is so. I need not resolve all those issues, least of all within the context of a statement of undisputed facts. It is undisputed, however, that on July 16 Couri resigned from the Braintech board, to be replaced by Kass; and on July 29 Krantz and Leibner resigned, leaving Kass as the sole Braintech director.

Kass at this point reached out to Stewart and asked him to rejoin the Braintech board. It is apparent that by this time, the disenchantment of Kass and Stewart with Couri, germinating for some time, had become total. Kass communicated with Nicolet representatives and asked that direct negotiations be resumed. A Nicolet team, including Keith Brue, flew to Newark Airport on the evening of July 29. Kass and

Stewart met them there. By this time, Nicolet owned about 40% of Braintech's common shares, by virtue of having exercised the Duffy and Culver options.

On July 30 Kass and Stewart met with Brue at the law offices of Weil, Gotshal & Manges. Weil, Gotshal represents Nicolet. It was perceived that separate legal representation should be obtained for Braintech. The firm of Baer, Marks & Upham undertook that responsibility.

Negotiations ensued which culminated in yet another letter of intent, accompanied by a stock purchase agreement and a stock option agreement. The parties to each of these agreements were Braintech and Nicolet. Those agreements are dated July 31, 1985. They were approved at the Braintech board of directors meeting on July 30. The minutes of that meeting reflect the election of Stewart and Brue as directors. Brue presented proposals on behalf of Nicolet which were subsequently accepted by Kass and Stewart as the majority of the Braintech board; Brue did not vote on these issues.

Specifically, at that meeting Nicolet purchased 2,450,000 shares of Braintech common stock at 20¢ per share for a total of $490,000, together with an option, for $10,-000, which would provide Nicolet with the right to acquire, also at 20¢ per share, an additional 2,000,000 shares. Of that $500,-000 total, $348,000 would be paid in cash, with the balance being made up of the $100,000 good faith deposit made under the prior letter of intent between Braintech and Nicolet, and $52,000 of cash advances previously made by Nicolet to Braintech "to pay various bills" (under circumstances which appear *infra*). The superseding Braintech-Nicolet agreement also contemplated the execution of further documents: an asset purchase agreement and a license agreement. Those documents were in fact agreed to. Their contents will be considered *infra*.

This newly constituted Braintech board sent Poseidon and Couri a letter formally terminating their services to Braintech.

### (E) *The Relations between Kass, Stewart, and Nicolet*

Before turning to the parties' claims and the resolution of factual disputes, it is appropriate to consider one additional aspect of the case where the facts are not disputed, although the characterizations to be placed upon those facts and the conclusions to be drawn from them most certainly are. This aspect of the case relates to contacts between Kass and Stewart on the one hand, and Nicolet on the other, during the interval between Nicolet's re-entry in the field in late May and the Braintech/Nicolet agreements of July 31.

On June 13, 1985, negotiations were in progress between Braintech and Nicolet. The June 4 meeting between representatives of the two companies had been held; the June 26 non-binding letter of agreement was still in the offing. On June 12 Nicolet sent one David Granquist, an accountant and resident of New Jersey, to the Braintech offices in South Plainfield to conduct an inspection of Braintech's premises and books of account. Kass, Stewart and Couri agreed to this mission, its stated purpose being to put Granquist in a position to advise Nicolet in the negotiations. But Granquist was to play a role other than that of auditor for Nicolet.

Granquist (destined to be a vice president for finance of Braintech after the events of July 31) maintained with his wife a joint personal checking account in a New Jersey bank. A time came when Nicolet loaned monies to Braintech for the ostensible reason of meeting some of Braintech's pressing obligations. Those loans were put in hand by Brue. One of Brue's first actions during this period was to agree that the salary of Suzette Stewart, William Stewart's daughter and one of three Braintech employees at the time (the other two being Kass and Stewart), be increased from $400 a week to $500 a week. Brue agreed to that increase in early June, prior even to the non-binding letter of intent between Braintech and Nicolet of June 26. Brue also undertook to fund payment of the salaries of Kass and Stewart. The vehicle

used was the personal checking account of Mr. and Mrs. Granquist, which had been fueled for the purpose by funds from Nicolet.

Specifically, by checks drawn on the Granquist account dated July 17, 1985, salary payments were made to William Stewart, Suzette Stewart, and Kass. A check also dated July 17, 1985 was made payable to the order of Wade Stewart, William Stewart's son, who had done some brief messenger work for Braintech during the summer. Further wage payments were made by Granquist checks to Stewart and Kass on August 1, 1985.

During this period of time, Kass and Stewart also entered into consulting agreements with Nicolet. On June 19 Stewart and Kass both flew to Nicolet's head office in Madison, Wisconsin, at the request of Nicolet representatives. Nicolet stated that they wished to discuss technological aspects with Stewart, and marketing and production aspects of the Braintech business with Kass. While in Madison, both Stewart and Kass signed agreements with Nicolet. Stewart signed a "consulting" agreement, and Kass an "employee" agreement. While Stewart testified at trial, Tr. 1291, that in his understanding the consulting agreement was to come into effect only if and when the Braintech/Nicolet deal closed, the document itself, Ex. 106, dated July 3, 1985, recites that the agreement commences:

> "... on the date of this Agreement and shall terminate two years from that date, unless Nicolet is unable to purchase the assets of Braintech, Inc. and receive an exclusive license to Braintech's patents, in which case this Agreement shall terminate September 30, 1985 ...."

The consultancy fee specified in the agreement was $100,000 over the term of the agreement.

When Couri learned of these agreements, he was angry, and reproached both Kass and Stewart, applying pressure to Stewart to resign from the Braintech board which, as noted, Stewart did.

As of June 30, 1985, Braintech owed Stewart and Kass just under $48,000 each in unpaid wages. In addition, Stewart and Kass had loaned personal funds to Braintech, receiving the company's notes in return. As of that date, Braintech owed Stewart $9,496.36 on his note. Braintech owed Kass $10,436.12 on his note. Suzette Stewart was owed $3,200 in back wages.

One of the provisions in the Braintech/Nicolet agreements negotiated during the period July 29–31, 1985 was the assumption by Nicolet of certain listed Braintech obligations. The foregoing amounts owing to Kass and the Stewarts were on that list. In consequence, Stewart and Kass knew, at the time they voted as Braintech directors for the Nicolet deal, that in doing so a solvent creditor would be substituted for an insolvent one in respect of these amounts owing to them.

(F) *Events of September 1985*

Two additional incidents of note occurred after the events of July 29–31, 1985. First, the asset purchase agreement between Braintech and Nicolet contemplated by the July 31, 1985 letter of intent was in fact executed on September 18, 1985. By that time, the Braintech board had been increased from three to five, Penrod and Cichy, employees of Nicolet, having been added. The Braintech board presently consists, therefore, of Brue, Penrod, Cichy, Stewart and Kass. Second, on October 30, 1985, Braintech entered into a new license agreement with Children's Hospital which gives Braintech an exclusive license to the three BEAM technology patents owned by Children's Hospital, in return for payment to Children's of $750,000. The funds for this payment were lent to Braintech by Nicolet, in return for a note from Braintech in the face amount of $750,000 plus twelve percent interest.

To close out this partial recitation of undisputed facts, it is sufficient to say that the asset purchase agreement negotiated between Braintech and Nicolet is subject to the approval of the Braintech shareholders. The meeting of shareholders to consider

that matter has been adjourned on the parties' consent pending this Court's rulings on the cross-motions.

## V.

*Relevant Statutory Provisions*

As noted *supra,* Nicolet and Braintech, and Poseidon accuse one another of having violated various provisions of the Securities Exchange Act of 1934 and SEC administrative regulations. The relevant statutory and administrative provisions are:

(1) Section 14(f) of the 1934 Act, 15 U.S.C. § 78n(f), which states:

"*Election or designation of majority of directors of issuer by owner of more than five per centum of class of securities at other than meeting of security holders*

"(f) If, pursuant to any arrangement or understanding with the person or persons acquiring securities in a transaction subject to subsection (d) of this section or subsection (d) of section 78m of this title, any persons are to be elected or designated as directors of the issuer, otherwise than at a meeting of security holders, and the persons so elected or designated will constitute a majority of the directors of the issuer, then, prior to the time any such person takes office as a director, and in accordance with rules and regulations prescribed by the Commission, the issuer shall file with the Commission, and transmit to all holders of record of securities of the issuer who would be entitled to vote at a meeting for election of directors, information substantially equivalent to the information which would be required by subsection (a) or (c) of this section to be transmitted if such person or persons were nominees for election as directors at a meeting of such security holders."

(2) SEC Rule 14f–1, 17 C.F.R. § 240.14f–1, which states in pertinent part:

"§ 240.14f–1 *Change in majority of directors.*

"If, pursuant to any arrangement or understanding with the person or per-

sons acquiring securities in a transaction subject to sections 13(d) or 14(d) of the Act, any persons are to be elected or designated as directors of the issuer, otherwise than at a meeting of security holders, and the persons so elected or designated will constitute a majority of the directors of the issuer, then, not less than 10 days prior to the date any such person take [sic] office as a director, or such shorter period prior to that date as the Commission may authorize upon a showing of good cause therefor, the issuer shall file with the Commission and transmit to all holders of record of securities of the issuer who would be entitled to vote at a meeting for election of directors, information substantially equivalent to the information which would be required ... to be transmitted if such person or persons were nominees for election as directors at a meeting of such security holders."

(3) Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), which states in pertinent part:

"§ 78j. *Manipulative and deceptive devices*

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

(4) SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, which states:

"§ 240.10b–5 *Employment of manipulative and deceptive devices.*

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

(5) Section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d), which states in pertinent part:

*"Reports by persons acquiring more than five per centum of certain classes of securities*

"(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

"(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

"(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

"(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof."

They also charge one another with having violated section 78.140 of the Nevada Revised Statutes, which states in pertinent part:

"78.140 *Common Directorships and Financial Interests of Directors and Officers: Disclosure of Facts.*—1. Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation. No contract or other transaction between a corporation and one or more of its directors or officers, or between a corporation and any corporation, firm or association in which one or more of its directors or officers are directors or officers or are financially interested, is either void or voidable solely for this reason or solely because any such director or officer is present at the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or because the vote or votes of common or interested directors are counted for such purpose, if the circumstances specified in any of the following paragraphs exist:

"(a) The fact of the common directorship or financial interest is disclosed or known to the board of directors or committee and noted in the minutes, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient for the purpose without counting the vote or votes of such director or directors.

"(b) The fact of the common directorship or financial interest is disclosed or known to the stockholders, and they approve or ratify the contract or transaction in good faith by a majority vote or written consent of stockholders holding a majority of the shares entitled to vote; the votes of the common or interested directors or officers shall be counted in any such vote of stockholders.

"(c) The contract or transaction is fair as to the corporation at the time it is authorized or approved.

"2. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or a committee thereof which authorizes, approves or ratifies a contract or transaction, and if the votes of the common or interested directors are not counted at such meeting, then a majority of the disinterested directors may authorize, approve or ratify a contract or transaction."

Finally, Braintech and Nicolet accuse Couri and Poseidon of having violated sections 78.210 and 78.270 of the Nevada Revised Statutes, which state in pertinent part:

"78.210 *Issuance of Stock for Services, Property: To be Fully Paid.*—1. Any corporation existing under any law of this state may issue stock for labor, services, or personal property, or real estate or leases thereof. Any shares issued for such a consideration shall be deemed fully paid if:

"(a) The entire amount; or

"(b) Not less than the amount characterized as capital pursuant to NRS 78.270 accompanied by the legally enforceable obligation of the subscriber to pay the balance of the subscription,

"has been received by the corporation. The judgment of the directors as to the value of the labor, services, property, real estate or leases thereof, is conclusive as to all except the then existing stockholders and creditors, and as to the then existing stockholders and creditors it is conclusive in the absence of actual fraud in the transaction."

"78.270 *Determination of Amount of Capital; What is Surplus.*—1. Any corporation may by resolution of its board of directors determine that only a part of the consideration which shall be received by the corporation for any of the shares of its capital stock which it shall issue from time to time shall be capital; but in case any of the shares issued shall be shares having a par value, the amount of the part of such consideration so determined to be capital shall be in excess of the aggregate par value of the shares issued for such consideration having a par value, unless all the shares issued shall be shares having a par value, in which case the amount of the part of such consideration so determined to be capital need be only equal to the aggre-

gate par value of such shares. In each such case the board of directors shall specify in dollars the part of such consideration which shall be capital.

"2. If the board of directors shall not have determined:

"(a) At the time of issue of any shares of the capital stock of the corporation issued for cash; or

"(b) Within 60 days after the issue of any shares of the capital stock of the corporation issued for property other than cash, what part of the consideration for such shares shall be capital, the capital of the corporation in respect of such shares shall be an amount equal to the aggregate par value of such shares having a par value, plus the amount of the consideration for such shares without par value."

## VI.

*Grounds for Granting a Preliminary Injunction*

All parties move for preliminary injunctions: Braintech and Nicolet against Poseidon and Couri; Poseidon and Drobbin against Braintech and Nicolet. I have summarized *supra* the preliminary injunctive relief sought.

The grounds in the Second Circuit for granting a preliminary injunction in battles for corporate control are the same as in other contexts. That is demonstrated by *Norlin Corp. v. Rooney, Pace Inc., supra,* a shareholder's suit to enjoin a board of directors under siege from voting stock owned by a wholly owned subsidiary and a newly created employee stock option plan. Judge Kaufman wrote:

"In this Circuit, a preliminary injunction will not issue without a showing of irreparable harm. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). In addition, the moving party must demonstrate either a likelihood of success on the merits, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in favor of equitable relief.

*See Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.,* 732 F.2d 1095, 1099 (2d Cir.1984)." 744 F.2d at 260.

I apply these criteria in the case at bar. First I will consider the motion of Braintech and Nicolet for a preliminary injunction against Poseidon and Couri. Then I will consider the motions for preliminary injunction which Poseidon and Drobbin make against Braintech and Nicolet.

Before doing so, I add a word on the procedural posture of these consolidated cases. While the hearing on the cross-motions for preliminary injunction was consolidated with that on the merits under Rule 65(a)(2), Braintech, Nicolet and Drobbin have demanded a jury trial in respect of the claims at law for money damages they assert in their pleadings: a right which the last sentence of Rule 65(a)(2) expressly preserves. In these circumstances, and recognizing that the prayers for permanent equitable remedies are considerably broader, I am nevertheless constrained by *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), to limit this Court's present holdings to the grant or denial of preliminary injunctive relief. At the plenary trial, should one occur, legal claims as to which a jury has been demanded must be determined prior to any final court determination of equitable claims. *Id.* at 479, 82 S.Ct. at 900.

## VII.

*The Motion of Braintech and Nicolet for a Preliminary Injunction Against Poseidon and Couri*

The grounds upon which Braintech and Nicolet contend Poseidon and Couri should be preliminarily enjoined are violations of the corporate law of Nevada, the state of Braintech's incorporation; and violations of sections 14(f), 13(d) and 10(b) of the Securities Exchange Act of 1934.

I will deal first with the Nevada law claims, which are cognizable in this Court under pendent or diversity jurisdiction.

## (A) *Nevada Law Claims*

Since battles for corporate power are perhaps fought more often in the courts and board rooms of New York or Delaware than in Nevada, the courts of that state follow United States Supreme Court precedent, decisions of other state courts, and the leading texts in the field. See, e.g., *Foster v. Arata*, 74 Nev. 143, 325 P.2d 759 (1958). Nevada follows corporate law rules "of well-nigh universal application," *id.*, 325 P.2d at 764.

Thus in *Foster v. Arata* the Nevada supreme court quoted and applied Justice Douglas's oft-quoted language in *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939):

"'A director is a fiduciary.... So is a dominant or controlling stockholder or group of stockholders.... Their powers are powers in trust.... Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.... The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.'" 325 P.2d at 765.

These principles find partial statutory expression in the first sentence of § 78.-140(1), Nev.Rev.Stat.:

"Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation."

Two basic obligations fall upon a director. Judge Kaufman summarized them in *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir.1984):

"A board member's obligation to a corporation and its shareholders has two prongs, generally characterized as the duty of care and the duty of loyalty. The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances."

\* \* \* \* \* \*

"The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship."

Such are the subtleties of human relationships that self-dealing and conflicts of interest may take many forms. "The conflict of interest of a director may arise not only out of one's personal business interests or one's directorship in another corporation; it may also stem from a desire to favor friends, relatives, or business associates." Henn & Alexander, *Laws of Corporations and Other Business Enterprises* (3rd. ed. 1983) at 638 n. 1, citing *Johnson v. Radio Station WOW, Inc.*, 144 Neb. 406, 13 N.W.2d 556 (1944). "However, merely because directors, who constitute a quorum, have no financial interest in the transaction coming before them for their consideration and vote, it does not necessarily follow that they are independent. For one reason or another the interested director may be in a position to and may dominate others on the board, e.g., because the interested director has stock control of the corporation and the other directors are elected by his vote, or because the others are close relatives of the interested director, or, where they are employees as well as directors, because he may effect their discharge.... Obviously such situations may belie the surface appearance of impartiality and disinterest. The independent representation of the corporation must be one not merely of form but of substance." Feuer, *Personal Liabilities of Corporate Officers and Directors* (1962). Employee directors of a corporation may not be independent of a domineering employer officer and director: "It makes no difference that there are enough directors voting for the resolution without counting the officer, if it is really his act and the product of his influence." *Adams v. Burke*, 201 Ill. 395, 66 N.W. 235, 236 (1903). An attorney-director

of a corporation is regarded in law as just as interested as is his client, also a director. *Sarner v. Fox Hill, Inc.*, 151 Conn. 437, 199 A.2d 6 (Conn.1964).

■ These declarations are only illustrative of the general principle, founded in common sense. Whether a director is "interested" or "independent" is generally regarded as a question of fact, depending on the circumstances of the case. *Gearhart Industries Inc. v. Smith International, Inc.*, 741 F.2d 707, 719 (5th Cir.1984).

Under Nevada law, § 78.140, the presence on the board of directors interested in the transaction at issue does not render it void or voidable if (a) the financial interest is disclosed and the board authorizes, approves or ratifies the transaction by a sufficient vote not including the interested directors; or (b) after disclosure a majority of the stockholders approve or ratify the transaction; or (c) the transaction is fair to the corporation at the time it is authorized or approved. Absent one of those saving circumstances, equity will set aside a transaction involving an interested director.

■ "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." *Norlin Corp. v. Rooney, Pace Inc., supra,* 744 F.2d at 264 (New York law). Accord: *Joseph v. Shell Oil Co.*, 482 A.2d 335, 340 (Del.Ch.1984) (Delaware law); *Gearhart Industries Inc. v. Smith International, Inc., supra,* 741 F.2d at 720 (Texas law). This is a rule of wide application. The parties do not suggest that Nevada law differs.

An inquiry into the "fairness" of a transaction is two-pronged, as explicated by the Supreme Court of Delaware in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.S.Ct. 1983):

"The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initi-ated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."

But "fairness" remains a single, overriding concept; the *Weinberger* court continued:

"However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."

While much is written of the "business judgment" rule, it has no office to perform when a director's self-interest is demonstrated. Judge Kaufman observed in *Norlin, supra,* at 265:

"... the business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue. *Treadway [v. Care Corp.*], 638 F.2d [357] at 382 [ (1980) ]. Once self-dealing or bad faith is demonstrated, the duty of loyalty supersedes the duty of care, and the burden shifts to the directors to 'prove that the transaction was fair and reasonable to the corporation.' *Id.;...."*

In the light of those principles, I consider the Nevada law claims against Poseidon and Couri. Braintech and Nicolet rely on three provisions of the Nevada Revised Statutes. The first is § 78.140(1), which I have just summarized. In addition, reliance is placed on §§ 78.210 and 78.270 discussed *infra.*

On the question of interested directors, no issue arises in respect of the May 31, 1985 letter agreement between Braintech, Poseidon and AMIC. The agreement was approved by Kass and Stewart, the only two Braintech directors at the time, and entirely disinterested within the context of this transaction. Therefore Nevada law gives no basis for challenging the 300,000

Braintech shares issued to Poseidon for entering into the May 31 agreement. The claim focuses upon later events.

On June 27 Poseidon acquired an additional 300,000 Braintech shares. While that acquisition is challenged, Braintech and Nicolet have not demonstrated a basis for doing so under Nevada law.

The stated consideration for these shares was Poseidon's services in negotiating the June 26 agreement in principle between Braintech and Nicolet. The evidence shows that Poseidon's considerable efforts in that regard produced a discernible result; and the compensation was approved by a validly constituted board, consisting at that time of Stewart, Kaplitt and Krantz. The minutes show that Krantz formally revealed his interest in Poseidon, which of course Stewart and Kaplitt knew about already; and Stewart and Kaplitt had no self-interest in that aspect of the transaction. Their affirmative vote satisfies § 78.-140(1)(a).

We have seen that at a meeting of the Braintech board on July 14, 1985, the board authorized issuance to Poseidon of 4.5 million Braintech shares. The consideration stated in the minutes was Poseidon's prior services valued at $50,000, and a $600,000 note of Poseidon personally guaranteed by Couri and Krantz. The board also authorized issuance to Poseidon of warrants for an additional one million Braintech shares at 18¢ a share.

It is common ground among the parties that the combined effect of § 78.210 and § 78.270, Nev.Rev.Stat., was to require that the par value of the shares be paid upon issuance in cash, labor, services, personal property, real estate or leases. The par value of Braintech's stock is 1¢. Accordingly a form of statutorily acceptable payment of at least $45,000 had to be demonstrated for the 4.5 million shares. The board ostensibly met that requirement by valuing Poseidon's services to Braintech at $50,000. A $600,000 Poseidon note, guaranteed by Couri and Krantz, was to form the balance of the consideration.

The three Braintech directors who voted to approve these actions were Krantz, Couri, and Jerry Leibner. Krantz and Couri, as shareholders of Poseidon, were accordingly financially interested directors within the context of § 78.140(1).

The parties dispute whether Leibner should be regarded as an interested director. If he is not, then arguably his individual vote is sufficient to validate this Braintech/Poseidon transaction under § 78.140(1)(a). On the other hand, if Leibner was an interested director, the transaction can be upheld only if it "is fair to the corporation [i.e., Braintech] at the time it is authorized or approved." § 78.140(1)(c).

I cannot accept Leibner as a disinterested director of Braintech. Although a law school graduate, Leibner had not since his graduation practiced law, instead pursuing various commercial ventures. However, in June of 1984, at the age of 40, Leibner was looking for an opportunity to get into law practice. He acknowledged: "Being 40 years of age and never having practiced law, it was not the easiest. I did not find myself in the best of positions to get a starting job in the legal field." (Tr. 1090). What Leibner found was a professional relationship with Krantz. Krantz supplied Leibner with an office and a telephone; and when Krantz had work for Leibner to do, he paid Leibner $100 per day. This arrangement was in effect when, on July 14, 1985, Krantz and Couri selected Leibner to fill the vacancy on Braintech's board caused by Stewart's resignation.

Leibner may not have been "financially interested" in Poseidon. But an individual may forfeit the saving status of "independent director" for more subtle, less direct entanglements and alliances. Henn & Alexander, *op. cit. supra;* Feuer, *op. cit. supra.* Given those practical realities, Leibner was clearly "interested" in continuing to enjoy the good will of his legal patron, Krantz. Leibner, at this stage of his career, was entirely dependent upon Krantz for an *entree* into the practice of law: an office, a telephone, backup services, compensable work, and prospects of meeting or

acquiring other clients. It is not realistic for Poseidon to argue that, in these circumstances, Leibner was a disinterested or independent director of Braintech at the time the July 14 votes were taken and resolutions passed.

That conclusion is only strengthened by the fact that Leibner had no prior knowledge of Braintech; did not attend the meeting on July 14; and relied, for the information necessary to inform and guide his judgment, upon selected readings and summaries of prior transactions and history which Leibner received from Krantz or Couri by telephone.

Notwithstanding the total absence of any disinterested or independent members of the Braintech board on July 14, the Braintech/Poseidon transaction may nonetheless be given effect if it was "fair" to Braintech. It is now necessary to consider that question.

The fairness to Braintech of the transactions with Poseidon memorialized in the minutes of the July 14 meeting requires little discussion. The transaction is unfair to Braintech because the consideration flowing to Braintech for the issuance of 4.5 million of its shares to Poseidon is almost entirely illusory.

As for the $50,000 in compensation for Poseidon's services, that compensation must be real, not illusory, in order to qualify issuance of these shares under §§ 78.210 and 78.270. It must also be considered within the broader context of fairness of the entire transaction.

One must recall that at the June 27 meeting of the Braintech board Poseidon was issued 300,000 Braintech shares "in consideration of its services in negotiating the Agreement in principle with Nicolet." That 300,000 shares was in addition to the 300,000 shares that Poseidon received for entering into the May 31 letter of agreement with Braintech. In consequence, the $50,000 compensation must be on a *quantum meruit* basis for services rendered by Poseidon other than negotiating the agreement with Nicolet.

This poses problems for Poseidon because the only identifiable by-product of Poseidon's activities was the agreement with Nicolet. I heard a great deal of evidence from Couri about his communications with creditors of Braintech; readings in the field; and contemplations of mergers and acquisitions. However, the Nicolet agreement was the only agreement to see the light of day. As far as one can deduce from the evidence, the creditors' accounts outstanding were the same or larger when Nicolet took them over after its July 31 agreement with Braintech than they were when Couri commenced his activities at the end of May. Poseidon made no discernible progress in realizing any of Braintech's accounts receivable. Couri negotiated with representatives of the Boston Children's Hospital, but the sensitive questions posed by the patents the Hospital held, and Braintech's disappointing performance as licensee thereunder, remained for ultimate resolution as part of the Braintech/Nicolet agreement.

In short, I find that $50,000 is an unrealistically generous value to assign to such of Poseidon's services as this figure was intended to cover. The sum does not pass muster under §§ 78.210 and 78.270.

Within the general fairness context, it is clear that payment for 4.5 million Braintech shares by means of a $600,000 promissory note executed by Poseidon and guaranteed by Couri and Krantz is equally illusory. Poseidon's note is endorsed: "Payment guaranteed by:", and then signed by Krantz and Couri. But Poseidon had no money; Couri had no money; and the evidence made it clear that being called on a $600,000 personal guarantee would ruin Krantz.

Couri testified that he told the other Braintech directors that all he intended by his "guarantee" was to see to it that the shareholders of Poseidon would come up with the money. Whether Couri said such a thing is disputed. I find that he did not. I find instead that, in accordance with the plain language of the instrument, Couri made a personal guarantee. But it makes

no practical difference, since there is no evidence in the record to prove—and much to call into doubt—the ability of Poseidon's shareholders to come up with $600,000 if asked to do so. I include in these observations the mysterious Tompkins, whose solvency is not revealed by the evidence. But it was for Couri, an interested director, to prove the economic fairness of the transaction.

Poseidon/Couri argue that any imperfections in the July 14 board meeting were cured by Kass's ratification of the minutes on July 18. As noted, on July 16 Couri resigned from the board and on July 18 Kass replaced him. There is a handwritten notation under the signatures of Krantz, Couri and Leibner to the July 14 minutes reciting that Kass considered and ratified all resolutions set forth in the minutes. Kass appended his signature, in a clearly different handwriting.

Braintech and Nicolet argue that Kass's purported ratification is a nullity as a matter of law. In their favor, there is authority for the propositions that "waste or a gift of corporate assets are void acts and cannot be ratified," as opposed to voidable acts, which can be; and that "a clearly inadequate consideration invokes the same principles as the absence of consideration," *Aronoff v. Albanese,* 85 A.D.2d 3, 446 N.Y. S.2d 368, 370 (2nd Dept.1982). Applying these principles, Kass could not in law execute a valid ratification of a transaction diluting Braintech's stock for a manifestly inadequate consideration.

But I need not reach the issue because, in any event, a ratifying director must be truly independent and free of duress. As discussed *supra,* on July 3 Kass had entered into an agreement with Nicolet, unbeknownst to Couri. Couri was angry when he found out, and obtained from Kass a resignation in blank of his office as Braintech president, which the board was holding when Kass rejoined it on July 16. (Tr. 393). Couri drafted and wrote the notation of ratification which he presented to Kass for signature on July 16. (Tr. 1046). Assuming *arguendo* that this transaction was capable of ratification by an independent director free of duress, I decline to so characterize the wretched Kass, with Couri poised above his head like an implacable Norn, capable at any moment of severing the frail lifeline connecting Kass to his presidential office.

■ It follows from all this that the Poseidon/Couri interests, bearing the burden of proving the fairness of the July 14 transactions, have failed to sustain it. They bear that burden, notwithstanding that Braintech and Nicolet are moving for a preliminary injunction. In *Norlin, supra,* which presented a comparable procedural posture, the Second Circuit said this:

> "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." 744 F.2d at 264.

I take this to mean that, if directors initially shown to be self-interested thereafter fail to prove the transaction is fair, the plaintiff seeking a preliminary injunction has shown the likelihood of success on the issue of fairness.

It follows in the case at bar that, assuming irreparable harm (discussed *infra*), Braintech and Nicolet are entitled to appropriate preliminary equitable relief in respect of the 4,500,000 Braintech shares, and warrants for an additional 1,000,000 shares, which Poseidon acquired on July 14. The appropriate remedies are also discussed *infra.*

### (B) *Federal Securities Law Claims*

#### (1) *Section 14(f) Violation*

The disclosure requirements of section 14(f) of the Securities Exchange Act of 1934 and SEC Rule 14f–1 are triggered whenever, "pursuant to an arrangement or understanding" subject to section 13(d) or 14(f) of the Act, a majority of the directors of a corporation are to be replaced without a vote of the shareholders. At least ten days before any person takes office as a

director pursuant to such an agreement, the issuer must file with the Commission and transmit to the shareholders the same information to which the shareholders would be entitled if the director about to take office were instead to be a nominee for election to office by the shareholders. 15 U.S.C. § 78n(f); 17 C.F.R. § 240.14f–1.

The May 31 agreement gave Poseidon and AMIC the right to designate a majority of the board of directors of Braintech. Immediately upon execution of the agreement, Poseidon and AMIC exercised that right by designating Krantz and Kaplitt respectively as two of Braintech's three directors. Krantz and Kaplitt took office that day.

The May 31 agreement was a transaction subject to section 13(d) of the Act because Poseidon obtained thereby a beneficial interest in more than 5% of the outstanding shares of Braintech stock. Since Krantz and Kaplitt took office pursuant to that agreement and together constituted a majority of Braintech's directors, Braintech was obliged to file and transmit to its shareholders the statement of information required by section 14(f).

After AMIC assigned all of its rights under the May 31 agreement to Poseidon on July 9, Poseidon, acting by and through Couri, held the exclusive right to appoint a majority of Braintech's directors. Poseidon exercised that right on July 13, after Kaplitt and Stewart had resigned, when Krantz, Poseidon's designee, appointed Couri as Chairman of the Board. It exercised that right a second time, on July 14, when Couri and Krantz appointed Leibner as the third Braintech director. Finally, it exercised that right on July 18, after Couri had resigned, when Krantz and Leibner reappointed Kass as a Braintech director.

These appointments were also made pursuant to Poseidon's right under the May 31 agreement to appoint a majority of Braintech directors. In fact, upon the resignation of Kaplitt and Stewart, and the appointment of Couri and Leibner, a clear shift in control of the board had occurred. At that point in time, the power to desig-

nate a majority of Braintech's directors rested solely with Poseidon. The three members of the board were all Poseidon's designees and Couri himself was the Chairman. Braintech's failure to comply with section 14(f)'s reporting requirements before Couri and Leibner took office constituted a second violation of that provision.

Thus from May 31 until July 28 (when Krantz and Leibner resigned), the Braintech board was controlled by Poseidon's and, for a time, AMIC's designees. Yet no disclosure of that fact was ever made pursuant to section 14(f), thereby depriving Braintech's shareholders of the right to reevaluate their investment in the corporation in light of this change in management control.

█ Braintech itself, as the issuer, was principally responsible for making the required section 14(f) disclosures. But Braintech and Nicolet allege that Poseidon and Couri are liable for Braintech's § 14(f) violations as "controlling persons" of Braintech within the meaning of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Section 20(a) provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

Neither the statute nor the SEC rules define what constitutes "control" for purposes of section 20(a) liability. But the phrase has been construed as "requiring only some indirect means of discipline or influence short of actual direction" by the alleged controlling person, *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). *Accord, SEC v. First Securities Co.*, 463 F.2d 981, 987 (7th Cir.),

*cert. denied sub nom. McKy v. Hochfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972). "[T]hat ... 'indirect means of discipline or influence' need not be stock ownership. It may arise from other business relationships, interlocking directors, family relationships and a myriad of other factors." *Harriman v. E.I. DuPont De Nemours and Company,* 372 F.Supp. 101, 105 (D.Del.1974).

Couri, acting by and through Poseidon, can clearly be said to have been in a controlling position with regard to the actions of Howard Krantz. Krantz was Couri's personal attorney and long-time friend, and was Poseidon's designee as director. Nevertheless, there is no evidence in the record upon which it could be said that on May 31, Couri and Poseidon controlled, directly or indirectly, the actions of the other Braintech directors—Kaplitt or Stewart; on the contrary, I believe their actions as directors were the product of their own independent judgment.

■ "Under the controlling person doctrine, the plaintiff must ... show that the defendant had the power to exercise control over the primary violator, based on a special relationship such as agency or stock ownership." *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y.1985). Braintech, as issuer, was the primary violator of section 14(f). Braintech and Nicolet have failed to establish that as of May 31, Couri and Poseidon had the power to exercise control over Braintech for purposes of the first § 14(f) violation. At that point, Poseidon shared its right to exercise control over the Braintech board with AMIC. I am not persuaded that Couri's and Poseidon's control over one director—Howard Krantz—is a sufficient basis for holding them liable for Braintech's first § 14(f) violation. Their control over Krantz was not, in these circumstances, control over Braintech.

On the other hand, Couri's and Poseidon's responsibility as controlling persons for Braintech's second § 14(f) violation is clear-cut. There can be no dispute that by July 13, Couri, as Chairman of the Board,

and Poseidon, with its now-exclusive right to designate the majority of Braintech's directors, controlled Braintech.

Couri and Poseidon could still escape liability by establishing the statutory defense that they acted in "good faith" and did not "culpably participate," directly or indirectly, in Braintech's § 14(f) violation. *See, Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 779 (3d Cir.1976); 15 U.S.C. § 78t(a). But on this record, the defense is unavailable to them.

Their asserted good faith reliance on an opinion letter of Braintech's corporate counsel, dated June 10, opining that performance of the May 31 agreement would not violate any statute or regulation, is meritless. That letter was issued one month before AMIC had assigned its rights under the May 31 agreement to Poseidon, and before Couri and Leibner became Braintech directors. In view of those significant developments, on July 13 Couri and Poseidon could not have relied in good faith on the June 10 advice of counsel.

Their second asserted defense, which concerns the degree of scienter required for aiding and abetting liability, is irrelevant because Braintech and Nicolet do not seek to hold Couri and Poseidon liable as aiders and abettors, only as controlling persons.

■ Under the plain language of section 20(a), a controlling person is liable to the same extent as the person he controls unless he can show that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation...." 15 U.S.C. § 78t(a). To the extent that there is any scienter requirement for such liability, it arises only in the context of that statutory defense. In *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied sub. nom. Wood Walker & Co. v. Marbury Management, Inc.,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the trial judge had concluded that a brokerage house could not be held liable for aiding and abetting a Rule 10b–5 violation by one of its employees

where the evidence showed "at most only negligence" on the part of the brokerage house. 629 F.2d at 710. On appeal, the Second Circuit held that it was "error not to pass on the respondeat superior and Section 20(c) issues which lurked in the record." *Id.* at 712. The Court then went on to consider the standard of supervision required by broker-dealers to establish a good faith defense to section 20(a) liability for fraudulent representations by its sales staff, stating that the brokerage house must show "at least that it has not been negligent in supervision, ... and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel." *Id.* at 716 (citations omitted). *See also, First Securities, supra,* 463 F.2d at 987. I construe *Marbury Management* as holding that the appropriate standard of conscious culpability for controlling person liability is mere negligence.

A negligence standard for controlling person scienter is particularly appropriate when the imposition of secondary liability is based on a violation of the reporting and disclosure requirements of the 1934 Act rather than on its antifraud provisions. In *SEC v. Wills,* 472 F.Supp. 1250, 1268 (D.D.C.1978), the court held that the Securities Exchange Commission need show only a negligent failure to comply with certain reporting provisions to establish the liability of a primary violator. *See also, SEC v. Savoy Industries, Inc.,* 587 F.2d 1149, 1167 (D.C.Cir.1978), *cert. denied, sub nom. Zimmerman v. SEC,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (SEC need not prove intentional conduct or "scienter," in sense of conduct different from negligence, to establish primary liability for violation of § 13(d) reporting provision). It would make no sense to impose a scienter requirement for one who is secondarily liable as a controlling person that is higher than the scienter required for primary liability.

I am aware that in *Hagopian, supra,* Judge Tenney of this Court held that under either an aiding and abetting or controlling person theory of liability, "... the defendant must have had actual knowledge of the violation, or the defendant must have had a fiduciary relationship with the plaintiff and have acted recklessly." 609 F.Supp. at 506. With all due respect, I find such a scienter requirement inconsistent with the language of section 20(a) which makes liability contingent on the status of being a controlling person, subject to the statutory defense. *See Harriman, supra,* 372 F.Supp. at 105 ("Under section 20(a) the participation of a controlling person in the transaction of which plaintiffs complain is not relevant to liability except insofar as the defendant may demonstrate, by way of defense, that he did not, 'directly or indirectly induce' that transaction."). Furthermore, a requirement of knowing intent or reckless disregard would be inconsistent with the Second Circuit's analysis in *Marbury Management,* in which negligence was considered an insufficient basis for aiding and abetting liability but a sufficient basis for controlling person liability.

There is no evidence in the record from which I could conclude that Couri and Poseidon have shown that they exercised "due care" in supervising Braintech's compliance with § 14(f) of the federal securities law during the period of time they controlled the company. *See, Marbury Management,* 629 F.2d at 716.

If I am wrong in assuming that negligence is a sufficient scienter requirement for controlling person liability for reporting violations under the federal securities laws, then I also find sufficient evidence in this record to conclude that as of July 13, Couri and Poseidon owed fiduciary duties to Braintech and its shareholders and acted recklessly in not insuring that the requisite § 14(f) disclosures were made before Couri and Leibner took office.

Under either standard, I find Couri and Poseidon liable as controlling persons for Braintech's second § 14(f) violation.

*(2) Section 13(d) Violations*

Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), requires a person who acquires beneficial ownership

of more than 5% of the outstanding shares of a company whose shares are registered pursuant to section 12(g) of the Act, *inter alia,* to file a Schedule 13D with the SEC within ten days of making such an acquisition. The Schedule 13D must disclose, *inter alia,* the identity and background of the filing person, the source and amount of funds or other consideration for the purchase of the shares, the shareholder's purpose in acquiring the shares, his plans for the company, and any contracts, understandings or agreements the filing person has with any person with respect to the company's securities. 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–101 (Schedule 13D and Special Instructions for Complying with Schedule 13D). If any material change occurs in the facts set forth in the filing person's Schedule 13D, an amended Schedule 13D setting forth updated information must be promptly filed. 15 U.S.C. § 78m(d)(2), 17 C.F.R. § 240.13d–2.

In their complaint, Braintech and Nicolet accuse Couri and Poseidon of committing numerous § 13(d) violations. However, in support of their request for preliminary injunctive relief they press only five of those claims. One of the alleged violations relates only to the issuance of 4.5 million shares and additional warrants of Braintech stock to Poseidon in July. (Brief at 63). Since I have already found that transaction to be unfair to Braintech and voidable, I need not consider the merits of that particular § 13(d) claim in determining the need for preliminary injunctive relief relating to those shares. But I will consider the four remaining § 13(d) claims relating to the issuance of 300,000 shares of Braintech stock to Poseidon on each of two earlier occasions.

■ The first is that Couri, as controlling person of Poseidon, failed to file his initial Schedule 13D within ten days after Poseidon became the beneficial owner of more than 5% of Braintech's stock under the May 31 agreement. Couri did file a Schedule 13D on his own behalf on June 24, 1985—more than two weeks after the deadline mandated by the SEC. That disclosure

brought Couri belatedly into compliance with the requirements of § 13(d). Nevertheless, when Poseidon became the legal owner of its first 300,000 shares of Braintech stock on June 14, Couri, Poseidon's controlling person, was in violation of the reporting requirements of § 13(d).

■ Braintech's and Nicolet's second claim is that Couri's and Poseidon's initial Schedule 13Ds and their first four amendments thereto failed to disclose that Couri was subject to a permanent injunction obtained by the SEC in civil litigation against Couri in this Court in 1979, which enjoins Couri from committing any further violations of certain federal securities laws. The existence of that injunction was disclosed for the first time in Amendment No. 5 to Poseidon's and Couri's Schedule 13Ds filed on July 29. (See Ex. 34, Appendix C). As Couri and Poseidon correctly note, mandatory disclosure of the existence of such an injunction is required on a Schedule 13D only if the filing person was a party to litigation resulting in entry of the injunction within the past five years. See Special Instructions for Complying with Schedule 13D, Item 2(e), 17 C.F.R. § 240.13d–101 (hereinafter the "Instructions"). The injunction against Couri was entered six years previously and did not have to be disclosed.

■ The third claim is that although Couri's conviction for making false statements to a bank is disclosed in both his and Poseidon's initial Schedule 13Ds, further detailed disclosure of Couri's role as the owner and operator of Plazagal and the nature and extent of his wrongdoing in connection with that enterprise was required.

The only information concerning criminal convictions which must be disclosed under § 13(d), according to the Instructions, are "the dates, nature of conviction, name and location of court, any penalty imposed, or other disposition of the case." See Item 2(d), 17 C.F.R. § 240.13d–101. Braintech and Nicolet acknowledge that the "bare facts" required by the Instructions were disclosed by Couri and Poseidon. But they

assert that disclosure of the more detailed information was required by SEC Rule 12b–20 because it would have been material to Braintech's shareholders and it was required in order to make the facts that were disclosed not misleading.

Rule 12b–20, 17 C.F.R. § 240.12b–20 states:

"In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."

Whether an omitted fact is material must be determined by the well-known standard laid down by the Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976): "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

Couri's and Poseidon's Schedule 13Ds disclose that Couri was convicted both of making false statements to a bank and of stock manipulation. That disclosure was sufficient to put any reasonable shareholder on notice that Couri's integrity was open to question, and that he had engaged in wrongdoing in connection with a corporate stock transaction. While more detailed information about the underlying offenses may have more readily alerted Braintech shareholders to the significance of those convictions, its omission does not significantly alter the total mix of information available to them, nor does it make what was disclosed misleading in any sense.

The strongest support for Braintech's and Nicolet's position may be found in *Berman v. Gerber Products Co.*, 454 F.Supp. 1310 (W.D.Mich.1978). In *Berman*, shareholders of a target corporation sued the corporation and its management for bringing an action against a tender offeror in order to halt the tender offer. The court concluded that management had a sufficient factual basis for its suit against the tender offeror, which alleged that the tender offeror had failed to make full and fair disclosure concerning certain improper foreign payments. The court's first criticism of the offeror was that the offeror had "avoided setting forth the facts of the operation in a simple, straightforward manner. Rather, it sought to camouflage the specific transactions by the continued use of euphemisms, generalizations and vague self-serving language that did not enlighten the shareholders about the true nature, scope and effect of the transactions and of management's involvement therein." 454 F.Supp. at 1323. The court went on to hold that under § 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), the offeror's disclosure regarding the foreign payments operation was "patently insufficient" because it failed to disclose information concerning the identities of the offeror's officials who took part in the scheme and the location and timing of the payments—all of which the court deemed material to the target corporation's stockholders. *Id.*

There are significant differences between the facts in *Berman* and the facts in the case at bar. First, in *Berman*, the initial disclosure of the foreign payments scheme was itself deceptive and misleading due to the use of vague euphemistic language which concealed the true nature of the improprieties. The same cannot be said of Couri's disclosure of his criminal convictions, which are laid out in a "simple, straightforward manner" in an Appendix attached to Poseidon's Schedule 13D. Second, disclosure of the identities of the offeror's officials involved in the improprieties was deemed necessary by the *Berman* court "so that a complete understanding of the management's integrity could be possible." *Id.* The question of Couri's own integrity was clearly raised by the disclosure that was made of his convictions.

Third, the *Berman* court's holding that the location and timing of the payments must be disclosed was premised on an understanding that there had been an adverse effect on sales by the offeror in some countries due to termination of the foreign payments operation. Consequently, the court deemed disclosure of the locations involved material so that the target company's shareholders could judge whether that adverse effect involved countries in which the offeror did a significant amount of business, and whether the target company also had operations in those countries that could subsequently be affected. No similar concerns are present in this case.

Braintech's and Nicolet's third § 13(d) claim is unavailing.

The fourth § 13(d) claim pressed by Braintech and Nicolet is that Couri and Poseidon disclosed the existence and terms of the June 26 letter of intent "to effect a business combination involving Braintech, Poseidon and Nicolet, without disclosing that the filing party—Poseidon—had decided not to proceed under the letter of intent, not to vote its shares in favor thereof, and not to infuse capital into Braintech as contemplated by the letter of intent." (Brief at 63 n. 43).

This claim really asserts two separate omissions. With regard to Poseidon's decision not to infuse capital into Braintech as contemplated by the letter of intent, I understand Braintech and Nicolet to be making the following argument: the June 26 letter of intent stated that a condition to the parties' obligations thereunder was that Poseidon and AMIC would have given Braintech $650,000 *cash* in return for 4.5 million shares of Braintech stock. Nevertheless, at a Braintech board meeting held the very next day, on June 27, it was agreed that those shares would be issued to Poseidon and AMIC in return for two promissory *notes* from Poseidon and AMIC, each in the amount of $325,000. At the same board meeting, Poseidon was awarded another 300,000 shares of Braintech stock for its role in negotiating the letter of intent with Nicolet.

No shareholder can claim to have been misled into believing Poseidon would pay cash for the 4.5 million shares because the board resolution authorizing issuance of those shares for notes was specifically disclosed in Amendment No. 3 to Poseidon's Schedule 13D dated July 3, at 6—nine days after the decision was made.

As far as Poseidon's failure to disclose that it would not vote its shares in favor of proceeding with the June 26 letter of intent is concerned, the record reveals that that decision was not reached by Couri until July 16. At that point, Couri had learned of the contracts which Kass and Stewart had entered into with Nicolet. He no longer felt Nicolet was trustworthy and was no longer sure that the deal was fair. (Tr. 893, 899–901, Ex. 22 at 11). Since Poseidon was then one of the largest shareholders of Braintech's stock due to the issuance of 4.5 million shares of stock to Poseidon on July 14, Poseidon's decision not to vote in favor of proceeding with the contemplated transaction with Nicolet would have had a significant impact on the outcome of a shareholder vote. This is especially true in view of the fact that Nicolet, the other large shareholder of Braintech stock, had agreed to vote its shares *pari passu* to the votes of the other public shareholders when the agreement was put to a vote. Poseidon had made no such agreement. Therefore, its decision not to vote in favor of the transaction was material information that should have been disclosed in Couri's and Poseidon's Schedule 13Ds. *See, Camelot Industries Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174, 1180–81 (S.D.N.Y.1982) (where condition for tender offer was defeat of management proposals at annual shareholder meeting, fact that two shareholders who together owned more than 10% of the outstanding shares had agreed to vote against the proposals was material information that should have been disclosed in Schedule 13D).

### (3) *Section 10(b) Violations*

In support of its application for injunctive relief against Couri and Poseidon,

Braintech alleges that they committed five separate violations of section 10(b) and SEC Rule 10b–5 in connection with Poseidon's acquisition of Braintech shares: three in connection with the issuance of 300,000 shares to Poseidon on June 14; one in connection with the issuance of a second 300,000' shares on June 27; and one in connection with the issuance of 4.5 million shares and additional warrants on July 14.

The elements of a 10(b) violation are well-known. Plaintiff must show:

"(1) a misrepresentation or omission of material facts by a defendant; (2) in connection with the purchase or sale of a security; (3) detrimental reliance by plaintiff on the misrepresentations or omissions; and (4) scienter on the part of the defendant[ ] ..."

*Jaksich v. Thomson McKinnon Securities, Inc.*, 582 F.Supp. 485, 493 (S.D.N.Y.1984). "A fifth element of a 10(b) action is that the defendants used 'any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange,' 15 U.S.C. § 78j(b)." *Id.* at n. 7.

### (a) *First 300,000 shares*

■ Braintech accuses Couri and Poseidon of making two false and misleading representations and intentionally omitting to disclose one material set of facts in inducing Braintech to enter into the May 31 agreement by which Poseidon obtained 300,000 shares of Braintech stock:

(1) that Couri represented himself to be a skilled "work out" artist who could lead Braintech to financial prosperity by contacting Braintech's creditors and restructuring its debt;

(2) that Couri falsely represented that Poseidon would infuse capital into Braintech by providing valuable consideration, i.e., cash, in exchange for issuance at a later time of millions of shares of Braintech stock; and

(3) that Couri failed to disclose his previous criminal convictions, his involvement in the Plazagal fraud, and the existence of an SEC permanent injunction against him.

All these claims fail for lack of proof of reliance by Braintech on the particular misrepresentation or omission alleged.

Braintech's first claim is that it was induced to enter into the May 31 agreement in reliance on Couri's intentional misrepresentation that he was a "skilled work out" artist.

Couri denied making any representations at all to Braintech at any time concerning his prior experience in working companies out of difficult financial circumstances. (Tr. 495). There is no evidence in the record upon which I could find that such an explicit representation was ever made by Couri.

But Braintech suggests that Couri, through his acts, conduct or statements, implicitly held himself out as "an experienced work out artist"; "that he could do the kind of job that he knew the company was looking for." (Tr. 2154). In truth, Braintech asserts and I find, Couri had no experience successfully working any company out of a financial crisis; on the contrary, he worked his own company, Plazagal, into bankruptcy. Braintech further contends that even if no implied affirmative misrepresentation was made by Couri, his failure to disclose his experience with Plazagal was an intentional omission of a material fact.

Assuming, without deciding, that Couri either implicitly held himself out as an experienced work out artist or failed to reveal that he was not, Braintech's 10(b) claim on this point fails for lack of proof of reasonable reliance by Braintech.

Stewart testified as to the only effort made by Braintech to check out Couri's background before entering into the May 31 agreement. He stated that on the night of May 30, an ad hoc meeting of the Braintech board of directors was held. The three then-directors of Braintech—Kass, Stewart and Tsao—were present, along with Ken Socha, Braintech's corporate counsel. The subject of Couri's "background" came up and the board discussed

the fact that it "had not done any due diligence." (Tr. 1919). After the meeting, Socha called Couri. Stewart, overhearing Socha's end of the conversation, heard him ask Couri if Couri could provide some information on his background. Socha then told Stewart that Couri said he would provide a resume and an article that had been written about him in some magazine. Stewart further testified that the article in question and a document more in the nature of a biographical sketch than a resume were eventually provided by Couri, but he could not recall when they were produced. (Tr. 1920).

Stewart's testimony proves, in sum, that Braintech's directors realized that they had a responsibility to investigate Couri's background; that their "investigation" consisted solely of requesting a resume from him; and that they did in fact receive certain information on Couri's background from Couri at an unknown time. Glaringly absent from this account is any proof that Couri provided misleading information on his background to Braintech prior to the time he received his first 300,000 shares of Braintech stock; or that he intentionally withheld the relevant information until he got the stock.

Stewart's testimony also makes it clear that the Braintech board was well aware of its own responsibility to do a due diligence investigation of Couri's background before proceeding with the transaction contemplated by the May 31 agreement. But the absence of evidence demonstrating that Braintech insisted on obtaining such information in a timely fashion before consummating the deal with Couri undercuts any claim that it relied on Couri's experience and credentials in entering into the May 31 agreement.

■■■ Braintech was a sophisticated seller of securities, represented by counsel and assisted by financial advisers, at the time it entered into its agreement with Poseidon. The sophistication of the plaintiff is relevant both to the adequacy of the defendant's disclosure and the extent of the plaintiff's reliance on any alleged misrepresen-

tation. *Quintel Corp. N.V. v. Citibank, N.A.,* 596 F.Supp. 797, 802 (S.D.N.Y.1984) and cases cited therein.

"The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment." *Hirsch v. du Pont,* 553 F.2d 750, 763 (2d Cir.1977). It appears that Braintech hired Couri as its financial savior because he talked a good line, and because Braintech did not bother to find out whether he had a track record that backed up his rhetoric. In the absence of any evidence that Couri affirmatively and expressly led Braintech to believe he had successful past work-out experience, and in the presence of evidence indicating that Braintech's directors realized that Couri's background might have a bearing on the wisdom of hiring him, I can only conclude that Braintech's complete failure to follow through with its investigation of Couri's background in a timely fashion reveals poor judgment on Braintech's part, which it may not now blame on Couri.

Braintech's second claim is that Couri falsely held himself out as a man of means, who could and would invest cash in Braintech in return for his shares. I have no doubt that Couri actively led Braintech to believe that he had the wherewithal to make a substantial investment in the company. I have already determined that Couri had a negative net worth and Poseidon, his shell corporation, had no assets. But a careful reading of the May 31 agreement reveals that there is no causal link between that misrepresentation by Couri and Braintech's sale of the first 300,000 shares to him.

That agreement states that Braintech issued those shares "as a retainer" and "[t]o induce Poseidon to render" certain services to Braintech, i.e., "restructuring its debt, negotiating a potential merger, consolidation, sale of assets, etc. and/or in obtaining additional debt and equity financing." (Ex. 2 at 1). The issuance of those shares was "in no event" to be made "contingent upon Poseidon's performance" of the agreement "or otherwise." *Id.* The agreement further provided Poseidon and AMIC with the

right, but not the obligation, to invest up to $500,000 in Braintech: "At such time ... as Poseidon and AMIC are satisfied with the arrangements made with [Braintech's] creditors, Poseidon and AMIC, or their designees, *may* each invest $250,000 in [Braintech's] securities ..." (emphasis added) (Ex. 2, ¶ 4). Thus the plain language of the agreement gives Poseidon and AMIC the right to invest in Braintech stock on certain terms and conditions, but in no way creates an enforceable expectation that they would do so.

Braintech's stated purpose in issuing the first 300,000 shares to Poseidon was to induce Couri to render work out assistance to the company. Although Braintech undoubtedly looked forward with eager anticipation to a cash infusion from Poseidon and AMIC once Couri had worked out a truce with the company's creditors, its belief that Couri and Poseidon would and could invest capital in Braintech at a later date did not cause it to issue the 300,000 shares to Poseidon under the May 31 agreement.

In *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir.1981), the court noted that "[t]he concept of reliance in a case of affirmative misrepresentations embodies two separate questions: (1) Did the plaintiff *believe* what the defendant said, and (2) was this belief the *cause* of the plaintiff's action?" 648 F.2d at 92, n. 6 (citation omitted) (emphasis in original). Both questions must be answered affirmatively to find reliance. Although Braintech believed Couri's representations as to his wealth, that belief was not the cause of its issuance of the first 300,000 shares to Poseidon. Thus Braintech did not rely on the misrepresentation, and its second § 10(b) claim fails.

Braintech's third claim is that Couri failed to disclose the fact that he had two prior criminal convictions, that he was subject to an SEC permanent injunction, and the facts regarding his involvement in the Plazagal fraud and bankruptcy.

The fact that Couri had been convicted for stock fraud and for making false statements to a bank was disclosed in Poseidon's Schedule 13D, which was filed with the SEC on June 10. Copies of that Schedule 13D were made available at a meeting on June 11, attended by Couri, Kass, Stewart, Kaplitt, and representatives of Nicolet. (Tr. 254, 257-8). Although Poseidon became the beneficial owner of its first 300,000 Braintech shares upon execution of the May 31 agreement, those shares were not issued to Poseidon by Braintech until June 14—three days after the fact of Couri's criminal convictions was made a matter of public record. In *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275 (2d Cir.1975), the court, in affirming the trial court's dismissal of a § 10(b) claim, noted "Even at common law, if the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by misrepresentations of the other party. *See Shappirio v. Goldberg*, 192 U.S. 232, 241-42, 24 S.Ct. 259, 48 L.Ed. 419 (1904)." *Id.* at 282. Cf. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984) (no common-law fraud where all information plaintiffs claimed had been concealed from them "was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part," by defendant). Furthermore, the issuance of those shares to Poseidon was ratified and approved by Stewart and Kaplitt, the two Braintech directors not appointed by Poseidon, on June 18, by which time both directors acknowledge having had actual knowledge of the fact of Couri's convictions. (Tr. 257-60; 1428-32; Ex. 3). Braintech's willingness to proceed with the transaction despite that knowledge indicates that it did not rely on the mistaken belief that Couri had no criminal record in selling him his first 300,000 shares of Braintech stock.

Braintech protests as irrelevant the disclosure of Couri's criminal convictions *after* he became the beneficial owner of the 300,000 shares on May 31 but *before* the stock certificates were physically delivered to Poseidon on June 14. It claims that for pur-

poses of § 10(b) liability, a "purchase or sale" of a security occurs at the "time when the parties to the transaction are committed to one another," citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir.1972).[1] Consequently, it argues, any knowledge acquired by Braintech regarding Couri's convictions after May 31 is not relevant to the question whether Couri committed a § 10(b) violation in failing to disclose it before May 31. But *Goldmuntz* does not sweep as broadly as Braintech suggests.

In *Goldmuntz,* the court upheld the trial court's instruction to the jury that the date at which *materiality* was to be determined, in the context of an insider's obligation to disclose material information, was the date when the insider had committed himself to purchase the plaintiff's stock, even if the formal delivery and payment occurred later. The court summarized the question presented in these terms:

> "The problem posed here for determination is whether the term 'commitments' adequately expresses that stage of the 'purchase or sale' transaction when disclosure of material information is required, but after which disclosure of late-learned relevant information is not necessary inasmuch as 'the choice of action in the transaction in question' had been made before the later information was known. We believe that it does." 464 F.2d at 890.

The court continued:

> "It was to effectuate the purpose of the Rule that we stated in *SEC v. Texas Gulf Sulphur, supra,* 401 F.2d [833] at 853 n. 17 [ (2 Cir.1968) ], 'that the time that an insider places an order, rather than the time of its ultimate execution, be determinative for Rule 10b–5 purposes.' See *Ryan v. J. Walter Thompson Company,* 453 F.2d 444, 447 (2 Cir. 1971); *Fershtman v. Schectman,* 450 F.2d 1357, 1360 (2 Cir.1971). In keeping with such purposes, we hold that Judge

Pollack correctly instructed the jury when he stated that the time of a 'purchase or sale' of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another. A party does not, within the intendment of Rule 10b–5, use material inside information unfairly when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information, for, as Judge Pollack instructed the jury, the Rule imposes 'no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge.' The goal of fundamental fairness in the securities marketplace is achieved by such a determination." *Id.* at 891.

Nothing in *Goldmuntz* precludes this Court from looking at evidence of disclosure occurring between the date of contractual commitment and the date of formal issuance of the shares in order to determine if Braintech *relied* on the alleged material omission. I recognize that Stewart testified that he did not think, once the agreement was signed, that Braintech had any choice in going ahead with the transaction. (Tr. 1431). But he did not even make the minimal effort to inquire of Socha, Braintech's counsel, as to Braintech's right to withdraw from the agreement in light of the new revelations. (Tr. 1430–31). I find Braintech's decision to consummate the deal despite its knowledge of Couri's criminal convictions, acquired after the purchase and sale agreement was executed, dispositive of the reliance portion of this § 10(b) claim.

The foregoing analysis also makes it unnecessary for me to decide related and disputed issues: whether, prior to May 31, Couri regaled Muller & Company representatives at various watering holes with detailed descriptions of his checkered past; and, if he did, whether such knowledge is

---

**1.** Miscited in Braintech's and Nicolet's brief as *Siegel v. United States,* 464 F.2d 891 (2d Cir. 1972).

imputable for § 10(b) purposes to Braintech.

Neither the details of the Plazagal fraud and bankruptcy nor the existence of the SEC permanent injunction were disclosed in the June 10 Schedule 13D. In fact, while the existence of the injunction was disclosed for the first time in a Poseidon 13D Amendment on July 29, the Plazagal details never were. But all that information would have been readily revealed if Braintech had done even the most minimal investigation into the circumstances surrounding Couri's convictions, of which they had notice.

The facts and holding of *Hirsch v. du Pont, supra,* are instructive on this point. In *Hirsch,* plaintiffs described as "all sophisticated and experienced businessmen," 553 F.2d at 761, brought an action under section 10(b) for alleged fraudulent inducement to purchase limited partnership interests in a brokerage firm. They sought to hold an accounting firm liable for aiding and abetting that violation on the ground that it had failed to disclose the existence and extent of the brokerage firm's 1969 net capital deficiency and the manner in which it was cured. The trial court dismissed the claim, finding that the accounting firm had no duty to disclose that information and that the information at issue was either immaterial or should have been discovered by plaintiffs through the exercise of due diligence. The Second Circuit affirmed, noting that a certain questionnaire in the hands of one Gariboldi, the controller of plaintiffs' general partnership, "revealed a possible massive capital deficiency." The court continued:

> "... [g]iven the information they possessed, we believe any reasonable investor of the [plaintiffs'] level of sophistication would have made a further inquiry.... Had Gariboldi been interested, he could easily have obtained from [the brokerage firm] the precise magnitude of the deficiency. Had he done so, he surely would have inquired how the capital required to restore net capital compliance was secured. Gariboldi's failure to pursue this line of investigation suggests either that, despite appearances, the knowledge he would have discovered was immaterial, see *Titan Group, Inc. v. Faggan,* 513 F.2d 234 (2d Cir.1975), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975), or that Gariboldi failed to exercise due diligence to obtain important information, see *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 409–10 (2d Cir.1974), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).

> "The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information. We believe that the diligence of the [plaintiffs] in this case fell far short of the mark."

553 F.2d at 762–3.

In the case at bar, it can only be said that on closely analogous facts, Braintech's failure to exercise due diligence in investigating the information available to it precludes recovery on this section 10(b) claim. *See also, Klamberg v. Roth,* 473 F.Supp. 544, 552 (S.D.N.Y.1979) (It is not deceptive to fail to disclose information that was "available by duly diligent inquiry").

Furthermore, since Braintech did not consider the fact that Couri had engaged in stock manipulation and had lied to a bank material to its decision to hire him as a work out consultant, it cannot now be heard to say that if only it had known the detailed facts underlying those convictions or the outcome of related civil litigation, it would not have gone forward with the transaction. *See Hassig v. Pearson,* 565 F.2d 644, 649 (10th Cir.1977) (omission of information "subsidiary to" basic piece of information, fairly disclosed, held to be non-material).

In sum, I find that none of Couri's misrepresentations or omissions were relied on by Braintech in its decision to issue 300,000

shares of stock to Poseidon under the May 31 Agreement; consequently, Braintech has no basis for relief in respect of those shares.

### (b) *Second 300,000 shares*

Braintech's fourth § 10(b) claim can be disposed of in short order. The company asserts that in connection with Poseidon's acquisition of a second grant of 300,000 shares on June 27, Couri falsely stated that he, on Poseidon's behalf, "had performed vital services for Braintech." (Amended Complaint ¶ 100). But there is no proof in the record that such a statement was in fact made. The minutes of the June 27 board meeting note that the board authorized issuance of that block of shares to Poseidon "in consideration of its services in negotiating the Corporation's Agreement in Principal [sic] with Nicolet Instrument Corp.; ..." (Ex. 20 at 5). It is not disputed that Couri did indeed negotiate the June 26 letter of intent with Nicolet. No evidence in the record contradicts the board's declaration that the second 300,000 shares of Braintech stock were issued to Poseidon on account of Couri's participation in those negotiations. Moreover, there was no testimony by any witness indicating that the board's authorization of such compensation for Poseidon was predicated on any representation by Couri that his efforts had been a "valuable" service to Braintech. This claim also fails.

### (c) *The 4.5 million shares and additional warrants*

Braintech's fifth § 10(b) claim is that in connection with the grant of 4,500,000 Braintech shares and 1,000,000 warrants on July 14, Couri and Poseidon falsely stated that they had performed valuable services worth $50,000 in connection with the proposed Braintech/Nicolet transaction. Braintech asserts that in truth, Couri and Poseidon had performed no such valuable services, that they had already been compensated for their work in connection with the Braintech/Nicolet transaction by the grant of the second 300,000 shares of stock Poseidon had already received; and that any services they had performed were not properly valued at $50,000.

I have already determined that the $50,000 compensation to Poseidon must have been for services rendered by it other than negotiating the June 26 agreement with Nicolet. I have also determined that whatever additional services were performed by Poseidon were not worth $50,000. These findings, together with the findings concerning the $600,000 note forming the balance of the consideration, are a sufficient basis for my conclusion that the issuance of those shares and warrants to Poseidon was unfair and voidable at Braintech's behest.

Therefore, for purposes of determining Braintech's entitlement of preliminary injunctive relief with regard to those shares, I need not and do not reach the question whether Poseidon and Couri committed a § 10(b) violation in acquiring them.

## VIII.

### *The Motions of Poseidon and Drobbin for Preliminary Injunctions Against Braintech and Nicolet*

Poseidon and Drobbin seek preliminary injunctions against Braintech and Nicolet on many of the same grounds as those asserted by the latter against Poseidon and Couri: Nevada law, particularly § 78.140(1); and §§ 14(f) and 13(d) of the 1934 federal act.

In addition, Poseidon and Drobbin rely upon that common law fiduciary duty which a majority or controlling shareholder owes to minority shareholders.

I will discuss these grounds in order. As a preface, it will be useful to describe in more detail the Braintech/Nicolet agreements which Poseidon and Drobbin attack.

There are four separate agreements: (1) a stock purchase agreement; (2) a stock option agreement; (3) a license agreement; and (4) an asset purchase agreement.

The minutes of the Braintech board meeting on July 30, 1985 reflect the following actions:

Stewart was elected a director.

Brue was elected a director. He stated that as an employee and representative of Nicolet, he would attend the meeting but not vote on any resolutions.

Baer, Marks & Upham were retained as counsel for Braintech.

Kass, Stewart and Granquist were elected as officers.

Brue presented an offer on behalf of Nicolet to purchase 2,450,000 Braintech shares at 20¢ per share (or $490,000); and, for an additional $10,000, to acquire an option to purchase an additional 2,000,000 shares, also at 20¢ per share. The total payment of $500,000 would be comprised of $348,000 in cash; and application of (a) Nicolet's $100,000 good faith deposit under the June 26 letter of intent, and (b) the $52,000 cash advances funneled to Braintech through the Granquist account.

The minutes of the meeting further reflect the anticipation of Braintech and Nicolet that, prior to the sale of the stock and the option, those parties would agree in principle on the terms of a license agreement between Braintech and Nicolet, and on the terms of a sale of certain of the assets and liabilities of Braintech to Nicolet. After all those terms were agreed upon, the minutes further reflect, it was expected that as soon as permitted under the Securities Exchange Act of 1934, two additional representatives of Nicolet would be added to the Braintech board. Finally, the minutes recited that as part of any agreement between Nicolet and Braintech, Nicolet would agree that for a ten year period of time, no merger of Braintech with Nicolet would be completed unless approved by a majority of Braintech's independent directors and the receipt of a favorable fairness opinion issued by a nationally recognized investment firm.

Kass and Stewart, with Brue abstaining, then voted to approve each of these offers and agreements. The meeting was adjourned for several hours in order to permit further consideration of the terms of the licensing agreement and the asset purchase agreement. When the meeting reconvened, Kass as Chairman presented an outline of agreements in principle, and Kass and Stewart voted to approve them.

The agreed terms and conditions of the license agreement and asset purchase agreement are set forth in a letter of intent dated July 31, 1985, signed by Kass on behalf of Braintech and Brue on behalf of Nicolet. The salient features are as follows.

(a) *Licensing Agreement.* Nicolet was to receive from Braintech a non-exclusive, worldwide, perpetual license by Braintech of Braintech's existing patents relating to the BEAM technology, and a similar sub-license of Braintech's rights under the patents owned by Boston Children's Hospital. Braintech would not grant to any third party a license or sublicense upon more favorable terms unless the license agreement with Nicolet received corresponding modifications. Nicolet would pay Braintech a royalty of 6% of all net sales by Nicolet of products covered by the patents. As a guarantee of future royalties, Nicolet was obligated to pay $1,000,000 on the execution of the license agreement, $200,000 four years thereafter, and $300,000 five years thereafter, such amounts to be credited against royalties to be earned, but payable by Nicolet in any event.

(b) *Asset Purchase Agreement.* Nicolet would acquire all the assets of Braintech excluding the patents and Braintech's rights under its exclusive license with respect to the Children's Hospital patents, and certain other exceptions. The principal aspects of the consideration paid by Nicolet are an assumption by Nicolet of Braintech's liabilities totalling $2,440,000 (according to schedules subsequently prepared), and the payment of $445,000 in cash.

Under the letter of intent, the asset purchase agreement (but not the license agreement) was subject to approval by Braintech's shareholders.

The letter of intent further provided that Braintech and Nicolet would cooperate in efforts to secure from Children's Hospital a new license agreement to supersede the existing license agreement between the Hospital and Braintech concerning three patents held by the Hospital with respect to BEAM technology. Braintech and Nicolet mutually intended that the new license agreement with the Hospital would be worldwide and exclusive, in consideration of a one-time payment by Braintech to the Hospital of $750,000.

In point of fact, as previously noted, such a license agreement was entered into on October 30, 1985. Nicolet loaned the $750,-000 to Braintech in return for a demand note in that amount plus 12% interest.

These are the agreements which Poseidon and Drobbin vigorously attack, upon the several grounds to which I now turn.

### (A) *Nevada Law and Common Law Claims*

█ Invoking § 78.140(1), Nev.Rev. Stat., Poseidon contends that (1) when these Braintech/Nicolet agreements were entered into, Kass and Stewart were "interested" directors of Braintech by reason of their relations with Nicolet; and that (2) Braintech and Nicolet have not proved the fairness of the transactions to Braintech and its shareholders. The governing legal principles are those discussed *supra* in relation to Braintech's and Nicolet's Nevada law claims on their cross-motion.

Kass and Stewart certainly had relations with Braintech. They are evidenced by various documents. The first were generated in early July. As noted, on June 19 Stewart and Kass had traveled to Nicolet's offices in Madison, Wisconsin for discussions. Thereafter Nicolet offered to Kass, and Kass accepted, an "employee agreement" dated July 2, 1985. Kass signed the document on July 3. Under the agreement, Nicolet was to pay Kass $4,166.76 per month. The agreement also provided:

"The term of employment shall be six months unless Nicolet is unable to purchase the assets of Braintech, Inc. and chase the assets of Braintech, Inc. and receive an exclusive license to Braintech's patents in which case employment shall terminate on September 1, 1985. Employment beyond six months is contingent upon the needs of both parties."

Also on July 3, 1985, Stewart entered into a written "consulting agreement" with Nicolet. That agreement called for quarterly payments of $12,500; and, as noted *supra*, further provided as to term:

"The term shall commence on the date of this Agreement and shall terminate two years from that date, unless Nicolet is unable to purchase the assets of Braintech, Inc. and receive an exclusive license to Braintech's patents, in which case this Agreement shall terminate September 30, 1985..."

When Couri learned of these agreements in a conversation with Socha, he regarded them as placing Kass and Stewart in a position of conflict of interest. That is an understandable reaction on Couri's part, since the amount of compensation of both Kass and Stewart under these agreements was contingent upon the Braintech/Nicolet deal going through.

Stewart acceded to Couri's criticism and undertook to rescind his consulting agreement. Stewart claims, and I find, that he performed no services under the agreement and received no payments. However, as noted *supra*, Stewart resigned from the Braintech board on July 13. As for Kass, he remained as president of Braintech, and replaced Couri on the Braintech board on July 16. At that time Couri exacted from Kass an undated letter of resignation.

The next direct contact between Kass and Stewart on the one hand, and Nicolet on the other, revealed by the evidence has to do with the payments out of the Granquist checking account later in July which I have previously described. The explanation of these transactions put forward by the Braintech/Nicolet interests is that during July, the cash situation at Braintech remained desperate. Salaries and vendors' bills were not being paid. In these circumstances, Nicolet decided in mid-June to ad-

vance funds to Braintech. These advances are characterized by witnesses such as Brue and Stewart as loans from Nicolet to Braintech which Kass, as president of Braintech, was authorized to receive. The Granquist personal account was set up as the vehicle for this infusion of funds into Braintech in order to avoid the grasp of Braintech's creditors. The documents in evidence reflect that Granquist received the first advance from Nicolet on June 14, and immediately began paying such items as Braintech's rent and telephone bills. As noted *supra*, these funds were also used to pay amounts to Kass, Stewart, Suzette Stewart, and Wade Stewart. The payments to Kass and Stewart represented monthly salary payments, based upon annual salaries which Braintech had not been in a position to pay for months.

Finally, as noted *supra*, the Braintech/Nicolet agreements negotiated during July 29–31 provided for the assumption by Nicolet of Braintech obligations which included unpaid wages and loans owing by Braintech to Kass and Stewart.

With straight faces, counsel for Braintech and Nicolet argue that these circumstances, either singly or in combination, do not characterize Stewart or Kass as directors of Braintech personally interested in the July and post-July transactions with Nicolet. They argue that the July 3 agreements were entered into in good faith, and in mutual contemplation of implementation of the June 26 Braintech/Nicolet letter of intent, the need for the services of Kass and Stewart during the period of transition being apparent. Furthermore, Stewart testified that as of the time of the Braintech board's actions on July 30–31, he at least regarded his July 3 consulting agreement with Nicolet as no longer in effect. (Kass did not testify at trial). As for the payments of salary to Kass and the Stewart family, it is said that Kass as president had the authority to accept a loan to Braintech from Nicolet for such purposes, and was not obliged to report them to the Braintech board (as he clearly did not). Finally, concerning the back wages and loans which Nicolet would pay under the agreements

negotiated at the end of July, Stewart testified that he simply did not regard those amounts as significant, and gave them no consideration in voting in favor of the Braintech/Nicolet accords.

I cannot accept these arguments. The agreements of July 3 and the subsequent salary payments must have combined to cause Stewart and Kass to regard Nicolet as a source of good things: indeed, the amount of good things to be generated by the employment and consulting agreements of July 3 depended directly upon Nicolet's acquisition of Braintech's assets and licenses. But assuming *arguendo* that these earlier factors should be considered in isolation and disregarded as of the events of July 30–31, there is no gainsaying the fact that Kass and Stewart, as Braintech directors, voted at that time for agreements with Nicolet which would result in payments to them of significant amounts they could not otherwise hope to receive.

Stewart testified that this made no difference to him in his evaluation of the Nicolet/Braintech agreements. In the main, I found Stewart to be a forthright and candid witness, testifying to the facts as best he could remember them. But the human mind's capacity for rationalization is unlimited. We are able, after the events in question, to persuade ourselves that we were not influenced by motives our consciences tell us we should have disregarded. However, I need not extend this foray into amateur psychology. The test must be an objective one, at least where we deal with figures of this magnitude. I cannot reach any conclusion other than, in the words of § 78.140(1) of the Nevada Revised Statutes, Kass and Stewart were "financially interested" when as directors of Braintech they voted for an agreement calling for Nicolet to pay them significant sums of money which were unavailable from any other source then known.

This means that all three Braintech directors at the time—Kass, Stewart, and Brue—were interested.

Accordingly the Braintech/Nicolet agreements must under the Nevada statute be scrutinized for fairness.

They must also be so scrutinized because of a fiduciary duty springing from another source upon which Poseidon and Drobbin properly rely. That is the common law obligation borne by a majority or controlling shareholder to a corporation and its minority shareholders.

 Just as a corporate director is a fiduciary, "[s]o is a dominant or controlling stockholder or group of stockholders," *Foster v. Arata, supra,* quoting *Pepper v. Litton, supra; Perlman v. Feldmann,* 219 F.2d 173, 175 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955) ("Both as director and as dominant stockholder, Feldmann stood in a fiduciary relationship to the corporation and to the minority stockholders as beneficiaries thereof."). Shareholders may hold a "dominant position" although owning less than a majority of the shares, *Foster v. Arata,* 325 P.2d at 765; it is sufficient if their holdings give them "working control" of the corporation. *Perlman v. Feldmann, supra,* 219 F.2d at 174 n. 1.

In the case at bar, Nicolet is taxed with this fiduciary duty as controlling or majority shareholder of Braintech, although the time it achieved that status is debatable. Poseidon and Drobbin may not agree between themselves. Counsel for Poseidon took the position, at least in their opening brief, that "fiduciary duties of good faith, loyalty, and honesty with respect to Braintech and its minority shareholders" descended upon Nicolet "[w]hen Nicolet became a majority shareholder of Braintech in July 1985..." Main brief at 29. Nicolet became the majority shareholder of Braintech as the result of the stock purchase agreement negotiated on July 30. However, counsel for Drobbin argued in summation that these duties fall upon a "controlling" shareholder as well, and that Nicolet should be so regarded prior to the July 30 meeting of the Braintech board. In that he is supported, ironically enough, by Gilbert Matthews, a managing director of

Bear Stearns & Co., called by Nicolet as an expert witness on the economic fairness of the transactions. Matthews testified that "control of Braintech effectively passed [to Nicolet] on the purchase of the stock from Duffy and Culver...[A] position owning 8 million-odd shares and 40-odd percent of a company was effective control of the company...with or without the purchase of the additional 2,450,000." (Tr. 1793).

I am not wholly satisfied that Matthews's opinion on the point squares with the facts. The most coherent evidence of share ownership in the record appears in the SEC filings of the various parties. The following analysis is drawn from Nicolet's section 13D filing of July 25, 1985 (Ex. 65), and Braintech's section 14(f) filing of August 30, 1985 (Ex. 16).

As of July 19, 1985, according to the advice of Braintech's transfer agent, Braintech had 18,564,044 shares outstanding. There is no evidence of significant further issues of stock between that date and July 30. On July 15 and 16, Nicolet had exercised their options to purchase the Duffy and Culver shares, which totalled 8,089,000 shares. In an amendment to its Schedule 13D filed with the SEC on August 9, 1985, Poseidon claimed to be the beneficial owner of 7,511,302 shares. While the validity of certain of Poseidon's acquisitions are at issue in this litigation, as of July 30 (on paper at least), the two rival groups were of roughly equal strength, the third force (smaller and less concentrated) being members of the public, as well as Kass and Stewart.

The burden of proof on the threshold question of whether or not Nicolet was a "controlling" shareholder of Braintech on July 30 falls upon Drobbin, the proponent of that proposition. It is questionable whether, on these figures and in the totality of circumstances, Drobbin has carried that burden. In any pre-July 31 battle for Braintech, the Poseidon and Nicolet armies would be drawn up in roughly equal array; *quaere* whether it may accurately be said that either one had "working control" of Braintech. If not, then the fiduciary duty

at issue did not descend upon Nicolet until it acquired the undoubted status of majority shareholder as the result of transactions approved on July 30.

But I need not decide the issue because, in any event, all aspects of the Braintech/Nicolet agreements are subject to scrutiny for fairness. That is because, as I have held, Kass and Stewart were interested directors at the time negotiations began.

And so I come to the fairness of those transactions.

■ I will first consider the stock purchase and stock option agreements. Poseidon and Drobbin challenge the fairness of the 20¢ per share price contained in these agreements. In summation counsel for Drobbin made the additional argument that, since Braintech bore the burden of proof and (in counsel's perception) presented none on the fairness of the price, this particular sale of Braintech shares to Nicolet, and this particular option, must be condemned as a matter of law.

I use the phrase "this particular" sale or option to emphasize that no one challenges the fairness or legality of Nicolet's prior acquisition of the Braintech shares owned by Duffy and Culver. While there were faint intimations early in the proceedings that Poseidon or Drobbin might charge Duffy and Culver with some sort of conspiracy or breach of fiduciary duty in respect of those earlier transactions, nothing came of the theory on the proofs.

It is true that neither expert witness called at trial directly addressed the fairness of the July sale of Braintech shares to Nicolet. Two expert witnesses testified. Gilbert Matthews gave evidence on behalf of Nicolet in support of the fairness of the asset purchase and licensing agreements. His brief did not include the stock purchase or stock option agreements, and he did not address them in his direct testimony (although, as noted *infra,* pertinent testimony on that issue emerged during cross examination). Samuel Herschkowitz, M.D., a practicing physician in the field of neuropsychiatry with some experience as a ven-

ture capitalist in biomedical technology, was called by Poseidon to testify in respect of the value, present and potential, of the BEAM technology. I consider that testimony *infra.* For present purposes it is sufficient to note that Dr. Herschkowitz was not asked to express, and in fact did not express, an opinion concerning the economic fairness of any aspect of the Braintech/Nicolet transactions, including the stock purchase and stock option agreements.

Notwithstanding this state of the record, I do not agree with counsel for Drobbin that the record is bare of evidence on the fairness of the stock purchase or stock option agreements. On June 6, 1985 Duffy and Culver executed options giving Nicolet the right to buy their Braintech shares at 18¢ a share. The option for the Culver shares was accompanied by a consulting agreement: arguably a complicating factor in respect of the agreed price. But no additional agreement accompanied the Duffy option. Dr. Duffy simply gave Nicolet an option to purchase all his shares at 18¢ a share. And that agreement was reached at the end of what everyone recognizes as an arms-length negotiation, unaffected by divided loyalties on either side.

It is important to remember that we are referring to that Dr. Duffy, a medical doctor, who invented the BEAM technology. Presumably Dr. Duffy is uniquely qualified to appraise his own technology's value and potential. Dr. Duffy agreed to sell his shares at a price of 18¢. That is, in my view, telling evidence of the fairness of a 20¢ price paid by Nicolet. It is particularly so when one considers that during the interval between the Duffy option and the challenged sale at the end of July, Braintech's financial condition had worsened, not improved.

The foregoing would seem to be a common sense proposition. To the extent expert testimony is required in corroboration, Matthews supplied it during one of his exchanges with cross-examining counsel:

"One factor here is that the—that Dr. Duffy and Mr. Culver who had in May or

June control of this company between them nonetheless were willing to enter into an option to sell that control position at a price, which if memory serves me correctly was 18 cents a share. That may have been a price for the option that would make that number slightly higher [sic].

"I had to assume that these gentlemen who obviously knew the product well entered into a transaction which was in their economic best interests. They had the ability if they chose as control shareholders to do exactly as you are suggesting, to sell all of the assets of the company including the patents and liquidate the company instead of selling their stock, and if they felt that could get them a number materially higher than the price they were to sell to, I have to assume as rational people they would have done so." Tr. 1761–62.

I conclude that Braintech and Nicolet have sustained their burden of demonstrating the fairness of the stock purchase and stock option agreements.

I turn now to the asset purchase agreement and the licensing agreement. On these agreements, the only expert evidence directly addressing the fairness issue is that of Matthews. Matthews gave his direct testimony in the form of an affidavit, thereafter being tendered at trial for cross-examination and redirect examination.

Matthews holds an MBA. He has been with Bear Stearns since 1960 and in its corporate finance department since 1967, serving as chairman of the valuation committee since 1968. The valuation committee reviews opinion letters issued by the corporate finance department, including "fairness opinions" concerning corporate transactions which Bear Stearns has been retained to give by one of the companies involved.

In the case at bar, Braintech retained Bear Stearns to render an opinion:

"...with respect to the fairness, from a financial point of view, to those common shareholders of Braintech other than Nicolet Instrument Corporation ('Nicolet')

of a proposed transaction (the 'Transaction') pursuant to which Braintech would enter into a non-exclusive royalty agreement with Nicolet and Nicolet would acquire substantially all of the assets of Braintech other than its rights to the BEAM patents and assume most of the liabilities." Affidavit at ¶ 3.

Matthews opined that the asset purchase agreement and the licensing or "royalty" agreement (which he viewed together and referred to as the "Transaction") were fair. His reasons appear at ¶ 6 of his affidavit:

"6. Based on the review described above, I am of the opinion that the Transaction is fair, from a financial point of view, to the shareholders of Braintech other than Nicolet. Bear Stearns' Valuation Committee has met and concurs in this opinion. Among the factors which I considered in reaching my opinion are the following:

"a. Braintech currently is insolvent and cannot meet its financial obligations to its creditors. Braintech currently has only four employees and is not in a position to become solvent or generate any meaningful revenues from its patents.

"b. If the Transaction is completed by December 31, 1985, it will immediately convert Braintech from a company with a *negative* equity of approximately $1.0 million to a company with a *positive* equity of approximately $1.4 million.

"c. Braintech's patents are to be developed and marketed by a competent manufacturer. I understand that Braintech's poor financial condition has adversely affected its reputation in the marketplace. Nicolet's good reputation in the health field should help promote and market the patents to Braintech's benefit and increase Braintech's credibility in the marketplace.

"d. The Transaction provides for Braintech's grant to Nicolet of a *non-exclusive* license to the BEAM patents. Thus, Braintech will be in a position to license its patents to other companies.

"e. The royalty rate of 6 percent on the license agreement provides Braintech

with the opportunity, without any capital expenditures on its part, to receive substantial royalty revenues if the BEAM system is financially successful. In any event, it guarantees Braintech a minimum royalty of $1 million immediately, plus $500,000 within five years, whether or not Nicolet is successful in marketing the systems.

"f. Braintech believes other companies may be infringing on its patents. After the Transaction, Braintech will have the financial ability to protect its patents.

"g. Braintech has been unable to take economic advantage of its patents. I understand that no person or entity other than Nicolet has been willing to come forward with an investment of capital to enable Braintech to develop and utilize the patents. The reality of Braintech's situation is that the Transaction enables Braintech's shareholders to benefit from the potential of the patents."

I find this reasoning to be persuasive, and not materially shaken during extensive cross-examination.

On cross-examination Matthews described the basic focuses of his inquiry, which were two in number:

"Well, what we attempted to determine was—the basic determination in this kind of a transaction is are the shareholders better off with this transaction or without this transaction. That's what we essentially were looking at."

To which a second consideration is added:

"Are they better off with this transaction or without it? And was there, in our mind, any reasonable prospect that they could get another better transaction within a time frame which the company could reasonably look forward to?

"Because of the condition of this company, there was clearly a short fuse on everything, because of their closeness to insolvency." Tr. 1735, 1736.

There was ample basis in the documents he reviewed for Matthews's description of Braintech's proximity to bankruptcy. Braintech's financial statements, which Matthews reviewed, demonstrated that during the period from March 31 to June 30, 1985, Braintech's "equity had declined by approximately $350,000 to a *negative* equity of approximately $550,000"; "the company was insolvent and unable to pay its rent and utilities"; and in August 1985 the corporation's auditors, Arthur Andersen & Co., "stated in its audit report that 'without completion of [the Transaction], the Company may be unable to continue in existence.'" Affidavit at ¶ 5.

Matthews concluded, not surprisingly, that if Braintech had not received this infusion of money from Nicolet, or comparable amounts from some other source, at about this time, Braintech would have gone bankrupt. (Tr. 1856). On cross-examination Matthews was asked to consider whether a liquidation of Braintech, in bankruptcy or otherwise, might not have been more favorable than the transaction concluded with Nicolet. Matthews thought not:

"...The alternative of liquidation did not appear to be as attractive as the ability to license and benefit from those licenses, especially considering the kind of multiple that earnings in this industry— this industry being broad scale medical technology rather than limited to brain waves—might generate." Tr. 1829–30.

Matthews concluded, in short, that in respect of the minority shareholders of Braintech and from a financial point of view, "there were no alternatives that were better." (Tr. 1833). Central to his analysis was Matthews's impression—with which Dr. Herschkowitz would not quarrel—that the Braintech patents were the source of a potentially valuable royalty income stream. But how was that golden stream ever to flow into the pockets of Braintech's shareholders, the company itself being "brain dead"? In Matthews's view, it would not have been appropriate "for us to ignore Braintech's financial condition in our consideration of the fairness of this transaction." And he added:

"We looked at the historical record of this company and concluded that without this transaction there was no earnings

potential in this company." Tr. 1743, 1800.

Poseidon and Drobbin argue that Braintech's condition at the time of the transactions is irrelevant; and that Matthews's opinion is deficient because he failed to perform a market analysis, or a going concern analysis, or a liquidation analysis, or a stock price analysis, or an analysis of the BEAM technology's earning potential, except within the context of Braintech's then-existing financial condition and management. They place particular reliance upon a series of Delaware cases: *Joseph v. Shell Oil Co.*, 482 A.2d 335 (Del.Ch.1984); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. Supr.1983); and *Poole v. N.V. Deli Maatschappij*, 243 A.2d 67 (Del.Supr.1968). Counsel for Poseidon contend that *Poole*, in particular, requires that Braintech's financial condition be disregarded as irrelevant, and the BEAM technology be given a "fair market value" without regard to the realities of Braintech's pre-transaction viability as a company.

These three cases all involved the valuation of shares in a functioning, viable corporation. Matthews is familiar with the methodologies referred to, and uses them "[i]f we are valuing a security"; but he regarded them as inappropriate to the fairness opinion asked of him in respect of the Braintech/Nicolet transactions. This exchange occurred on cross-examination:

Q. Now, in reaching a conclusion as to value, normally isn't it true that Bear, Stearns looks at three basic areas: The market value of the entity, its asset value, and its going concern value?

A. Yes. That is when we are—but—that is the standard we would use in determining the fairness of the acquisition of the shares of a company.

I don't know how one can use those specific standards in this kind of a transaction. This is a different animal, and, you know, the relevance of the market value of the shares—there is no relevance to the market value of the shares for purpose of determining the fairness of this transaction.

If we had been asked to opine, for example, as to the fairness of selling 4.5 million shares to Mr. Couri, it would have been relevant to consider such factors as the market value of the shares. That is not what we were asked to opine to. We were asked to opine to the fairness of a specific transaction that did not involve the sale of shares of the company. Tr. 1732–33.

And again:

Q. In fact, you didn't employ any recognized method of valuation analysis at all in rendering your opinion, did you?

A. I don't think that's correct. I think that—I think that a recognized standard of value would be the relative position of shareholders before and after a transaction.

This is not a transaction that lent itself to certain other methods of analysis and therefore we used the methodology that we considered appropriate for this transaction, which is a methodology which we have used in other transactions. Tr. 1802.

Matthews made it clear that he would not regard *any* benefit to the Braintech shareholders as financially "fair," solely because anything is better than nothing. The immediate value to Braintech is about $4,000,000: the assumption of just under $2,500,000 in liabilities; the payment of $445,000 for the assets; and an immediate payment of $1,000,000 in advance royalties. Counsel, cross-examining, reduced (for no apparent reason) that present value to $3,000,000, and then put this question, to which Matthews gave the following answer:

Q. Given the current management and the financial condition of Braintech, if the value of this transaction were only half a million dollars as opposed to three, under your analysis wouldn't that also be a fair transaction?

A. I don't know what the break point is. I say that's too a [sic] low a number because that would not put the company in a position of solvency and strength. Unless the consideration was enough to enable the company to be viable after the

receipt of whatever funds were received, it would be of limited value.

If, for example, if, let us assume the consideration was exactly the same but it was in the form of a five year note, five year noninterest bearing note, the transaction would not be fair, because this company needed liquid assets. It is not solely the value of the consideration that comes into effect, it's the form of the consideration. Tr. 1802–03.

In short, Matthews regards the Nicolet transactions as fair and beneficial to the Braintech shareholders because they restore a moribund company to a condition of "solvency and strength," which, by virtue of retention of its patents and the awarding of a non-exclusive (as opposed to exclusive) license to Nicolet, is in a position for the first time to entertain a reasonable hope of a royalty income stream.

The critics of the Braintech/Nicolet transactions called no expert witness to challenge those conclusions of Matthews which I have quoted, and which seem to me persuasive. Of course, counsel have a First Amendment right to express disagreement with those conclusions, a right which they exercised during summation. They are also entitled to argue, without benefit of expert opinion testimony, that controlling case law renders Matthews's methodology and resulting opinion unworthy of acceptance. Counsel for Poseidon argues, in particular, that the *Poole* case requires that result. I do not agree. *Poole*, as noted, involved the value of stock in a going corporation. The particular point at issue was the proper evaluation of the stock for purposes of determining damages from a stock sale induced by fraudulent misrepresentation. I am bound to say that I find the headnotes in *Poole* considerably more lucid than the text from which they are derived. According to headnotes 1 and 2, the evaluation of stock for the described purpose should be made on a going-concern basis. As for the corporation's assets, the court should look to their "fair market value" when the assets are considered as an "element of stock value." Headnote 2. The fact that the *Poole* court

endorsed the fair market value of the assets only within the context of valuing the stock appears clearly enough from the discussion at 243 A.2d 70. It does not follow that "fair market value"—defined in *Poole* at 70 n. 1 as "the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the buyer to buy"—should be used when we are considering not the true value of stock, but the fairness of the transaction at bar, involving a sale of assets. Such an application of the "fair market value" concept would represent an extension of the ruling in *Poole*, in a manner which Matthews regards as inappropriate. On the stand, Matthews accepted my own paraphrase of his testimony: "That there is more value to a sword in the hands of Goliath than in the hands of Lazarus before the miracle." Tr. 1743. That proposition seemed sensible to me then; it does now; and there is no expert evidence in the record contrary to Matthews's views.

Another point of criticism is that Matthews conducted no independent inquiry or survey of other prospective bidders for the BEAM technology. That is true enough; but Matthews was not acting in a vacuum on this score. His opinion in affidavit form, quoted *supra*, reflects his understanding "that no person or entity other than Nicolet has been willing to come forward with an investment of capital to enable Braintech to develop and utilize the patents." Not only is that true, I find from the evidence that Braintech and its advisors had made repeated and incessant efforts over the preceding two years to attract additional capital. Stewart described the efforts made by Braintech's management, together with Culver and Duffy. The witnesses from Muller & Company, Braintech's investment advisors, described their unsuccessful efforts to obtain new funding. Documents in evidence reflect that the Braintech technology was well publicized, and its existence known to the industry. Indeed, a representative sampling is at-

tached to the affidavit of Dr. Herschkowitz. Braintech may indeed have invented a superior mousetrap; but nobody was beating a path to its door, despite earnest efforts to attract suitors. Matthews properly factored those circumstances into his opinion.

Poseidon and Drobbin emphasize two documents in evidence. One of these, Ex. 103, is a memorandum dated June 20, 1985 sent by Krauss, president of Nicolet, to the Nicolet board of directors. The memorandum discusses the status of Nicolet's negotiations with Braintech (then being represented by Couri); and contains this paragraph:

- "The next two documents attached are a brief and conservative 3-year forecast on the incremental sales and net profits from BEAM and related businesses and an analysis of the projected available market and probable sales by Nicolet from this business activity. The assumption of a net after tax profit of 10% on this probable volume should be achievable with proprietary technology. The net present value of that net after tax profit for the life of the patent is $11,632,153 using a 12% cost of money (sheet 1) and $9,212,336 using a 15% cost of money (sheet 2). Worst case then would be a return of 436% over the life of the patent on a net present value basis. The cost of the royalties is absorbed in the operating expenses and the cost of money for the prepaid $1,000,000 royalty is covered in interest expense charged to the BEAM business activity."

Poseidon argues that the suggested $11,632,153 "net present value of that net after tax profit for the life of the patent," together with a calculation in the accompanying schedules of after tax profits exceeding $35,000,000 by the year 2000, demonstrate the unfairness of the transaction.

At the time Krauss prepared that memorandum, the consideration contemplated from Nicolet was $2,110,000. After Couri was displaced, the transactions that finally emerged involved consideration totalling $4,000,000.

I do not regard the Krauss memorandum of June 20 as a "smoking gun" demonstrating beyond any question the unfairness of the present transactions. Matthews, asked to assess the Krauss memorandum and its accompanying projections, testified first that he regarded the projections as "somewhat on the optimistic side." (Tr. 1838). He added:

"First of all, even though he [Krauss] talks about this as being the conservative valuation, my experience with this kind of thing is that you would describe the optimistic calculation as being the one you have a five percent chance of achieving and the conservative one is the one you have a 50 percent chance of achieving if everything works right all the way through. So I tend to take any estimate of this kind with a substantial grain of salt." Tr. 1840.

Secondly, Matthews expressed doubt "that Nicolet had taken into effect in these calculations all of the capital costs that would be involved in developing this technology." (Tr. 1840). He testified:

"Considering the relative merits of the profitability to Nicolet and the investments that they would have to make to generate that income as against the share of the income going directly with no cost to Braintech for the licensing, I do not feel that the disparity [between the Krauss projections and the purchase price] was unreasonable." Tr. 1838.

I find these opinions persuasive.

Opposing counsel also refer to a letter dated July 18, 1985 which Analogic Corporation, a publicly held company in the field of manufacturing and marketing medical diagnostic equipment, addressed to Couri. At this time Couri was still negotiating on Braintech's behalf. The Analogic letter, signed by Julian Soshnick, its vice president and general counsel, confirms a prior conversation with Couri to the effect that Analogic "still maintains an interest in pursuing discussions with Braintech Inc. concerning our desire to utilize the existing Braintech technology, patents, and software for medical purposes." Soshnick

says that he is aware of the pending negotiations with Nicolet, and advises that his letter of July 18 "should not be interpreted as any attempt to make a counter-offer to any that may have been made to you by these third parties," i.e., "Nicolet and perhaps others." The Analogic letter concludes:

"Nevertheless, should your discussions with Nicolet and/or others not be concluded satisfactorily, based upon our belief that the utilization of your technology could be used to develop a business in the neurological field of approximately $30,000,000–$40,000,000 per year, we would be happy to initiate discussions with you ourselves."

Those dollar figures are also urged as evidence of the insufficiency of the consideration received from Nicolet. However, unlike Krauss, Soshnick was not deposed and submitted to cross-examination; nor did he appear at trial. Accordingly the hearsay rule precludes consideration of this letter as evidence of the truth of matters asserted: in particular, the value of the BEAM technology. I did admit this evidence as probative of information available to Braintech management, as an explanation of their own subsequent actions; however, there was no follow-up with Analogic, Couri preferring to concentrate upon Nicolet until the time he was deposed. There is evidence of an earlier, pre-Couri overture by Analogic to Braintech, which was of no particular economic assistance or interest to Braintech. There is, in short, nothing in this particular letter which undermines the probative force of the Matthews testimony.

Much evidence was offered on the relative values of the Braintech hardware and software. Matthews acknowledged that he was not an expert in software, and had not undertaken to value it separately. But Matthews was aware that Braintech had gone through a considerable period of time trying to interest anybody in any arrangement which would infuse helpful capital into the failing company, entirely without success.

I find that Braintech and Nicolet have sustained their burden of demonstrating that the cluster of Braintech/Nicolet agreements are economically fair to the Braintech shareholders other than Nicolet. That is because, in essence, Braintech will be rescued from imminent bankruptcy and a forced liquidation sale; it will retain all five of its patents, with their development and marketing passing into the hands of a competent corporation; Braintech acquires significant payments now, and the hope of royalty income in the future; and it retains its ability to license its patents to others. The transformation of Braintech from a moribund entity into a solvent and viable corporation, with anticipations of future earnings, qualifies as a fair transaction. No doubt Nicolet could have paid more. But the law does not require that it pay more than is "fair"; and I conclude that this transaction was fair.[2]

Before reaching that conclusion, I have carefully considered the testimony of Dr. Herschkowitz, called as an expert witness by Poseidon. I accept Dr. Herschkowitz's testimony as far as it goes. But that testimony does not directly address the economic fairness issue; and the opinions Dr. Herschkowitz does express are based on a series of assumed circumstances which blunt their impact.

---

**2.** In significant respects, the July 31 letter of intent between Braintech and Nicolet is more favorable to Braintech than the letter of intent Couri negotiated for Braintech with Nicolet in June. The June letter of intent gave Nicolet exclusive licenses on the patents, and called for a 5 percent royalty. The present agreements call for non-exclusive licenses, and a 6 percent royalty. The other provisions are comparable. There is a consequently hollow ring to Couri's present contention that the July agreements are unfair. He argues that he was denied access to technical knowledge concerning Braintech's true value. Nicolet, Kass and Stewart are said to be members of a conspiracy of silence. I am not persuaded. On the basis of demeanor evidence, I do not believe Stewart acted in so dishonorable a fashion. And there was at least one other ready source of technical information presumably available to Couri: Dr. Duffy, the technology's inventor.

Herschkowitz did not undertake to give an opinion about the economic fairness of the Braintech/Nicolet transactions. His brief, as reflected by ¶ 1 of his affidavit, was "to perform a preliminary analysis and opine on the value" of the BEAM technology. That task, of course, is consistent with Poseidon's contention under *Poole, supra,* that only the "fair market value" of Braintech's assets is relevant to the fairness of this particular transaction.

Surely Herschkowitz's valuation is enough to make any investor breathe more rapidly. His "preliminary conclusions" are these:

"(a) In its present format, the BEAM technology has a value in excess of $24 million;

"(b) If the BEAM system were reduced in size and cost, as seems feasible, the BEAM technology would have a value of between $57 and $75 million;

"(c) If the potential non-neurological applications of the BEAM technology were developed, the value of the BEAM technology would increase enormously to a level in excess of $100 million." Affidavit at ¶ 6.

As further explained in his affidavit and clarified on cross examination, the Herschkowitz opinions come down to this:

(a) The "present format" value of $24 million assumed a sale of 107 machines at an average profit of $225,000, based in turn on a June 1983 Braintech price list which bore little resemblance to the lower prices for which Braintech had sold the few machines it placed. Those profits would, of course, only be available "on a current basis to a firm which was properly financed and positioned to develop the machines." Affidavit at ¶ 14.

(b) The BEAM technology would be even more valuable if further developed to achieve a reduction in size and application in non-neurological diagnostic areas.

Herschkowitz's present value of $24 million assumes that the technology is in the hands of a solvent and viable company, able to market it. Braintech was not such a company, and its shareholders did not own such a company. This is really a reprise of the market valuation controversy, originally considered in connection with Matthews's testimony. If I am right in considering Braintech's condition as a factor in the fairness of this transaction, much of the underpinning of Herschkowitz's opinion is removed. In addition, the amount based upon myriad assumed future sales is clearly not available at present, even with the technology in the hands of a viable marketer; and the assumed profit margin is called into question by the actual sales history, even allowing for Braintech's infirmities.

As for improvements of the technology based upon further development, of course I accept Herschkowitz's view that if achieved, they would make the technology more valuable. This is a common sense proposition. On a humbler level, if a Cuisinart could also mix drinks and shine shoes it would sell for more money. I also accept Dr. Herschkowitz's opinions, there being no evidence to the contrary, that the BEAM technology can be reduced in size and price, and applied "not only to the analysis of brain waves but also to the areas of cardiology; ear, nose and throat medicine; ophthalmology; and orthopedics, among others." Affidavit ¶ 16. But there is no telling when such breakthroughs might be achieved, or at what cost in research and development. Certainly no present applications of these possibilities exist. I conclude that such possibilities, exciting as they may be, are too tenuous to factor into an evaluation of present asset value.

In sum, Dr. Herschkowitz's opinions do not alter my conclusion that the Braintech/Nicolet agreements are financially fair to the shareholders of Braintech other than Nicolet.

(B) *Federal Securities Law Claims*

Although Poseidon's counterclaims raise a host of alleged violations by Braintech and Nicolet of sections 14(f), 13(d) and 10(b) of the 1934 Act, it presses only two claims

in support of its application for preliminary injunctive relief: one under section 14(f) and one under section 13(d).

### (1) *Section 14(f) Violation*

■■■ Poseidon claims that Braintech was required to file a statement of information pursuant to section 14(f) before Keith Brue, a Nicolet employee, took office as a Braintech director on July 30, and that Nicolet is liable, either under a controlling person or aiding and abetting theory, for Braintech's failure to do so. It bases its § 14(f) claim on the assertion that an understanding had been reached between Nicolet and Braintech, before Brue was appointed to the board, that: (1) Nicolet would appoint one of its people to the Braintech board immediately; (2) the number of directors on the Braintech board would be increased from three to five; and (3) Nicolet would be entitled to appoint the individuals who would fill the two newly created directorships. The net result of this agreement would be to empower Nicolet to appoint a majority of the members of Braintech's board. Since section § 14(f) requires certain disclosures to be made at least ten days before "any ... person" takes office pursuant to "any arrangement or understanding" which results in appointment of a majority of directors, Poseidon claims Braintech was required to file and disseminate to its shareholders a § 14(f) statement of information before Brue took office.

Nicolet and Braintech dispute the timing of one crucial event in Poseidon's scenario. They insist that the agreement to increase the number of directors from three to five and to let Nicolet's designees fill those new slots was not made until after Brue took office. Consequently, they argue, Brue did not take office *pursuant to* an arrangement or understanding giving Nicolet control of a majority of Braintech's directors, and no § 14(f) reporting requirement arose until after Brue was appointed and the agreement was reached.

The evidence in the record sustains Poseidon's contentions. Stewart, who con-ducted the negotiations with Nicolet on July 29–30 on behalf of Braintech, aided by Kass, testified that the agreement to expand the board and give Nicolet power to designate a majority of Braintech's directors was reached before Brue took office on July 30:

Q. You called Mr. Brue on the 29, you testified, and invited him to join your board; is that right?

A. I invited him to have Nicolet designate a board member, yes. Not necessarily him in person.

Q. And he then came to Newark with Mr. Cichy and Mr. Fitzgerald and you met at nine p.m. with them; is that right. [sic]

A. About that.

Q. And that meeting lasted until about three in the morning, I believe you testified?

A. Somewhere around there, yes.

Q. I think you testified that you emerged from this meeting with the framework of what later was to emerge to become the July 31 letter of intent and the July 30 transaction as reflected in the July 30 minutes; is that correct?

A. What is—we emerged from that with some of the understandings, yes.

Q. There was a subsequent meeting in the morning in the offers [sic] of Weil, Gotshal law firm; is that correct?

A. That is correct.

Q. But you had not yet secured counsel to represent Braintech at that time; is that right?

A. That is also correct.

Q. And.

Q. Isn't it correct that at that time you discussed the issuance to Nicolet of 2.4 million shares and 2 million options, and agreed to do that?

A. I believe that was, yes.

Q. And at that time you agreed also that Nicolet would put Mr. Brue on the board?

A. I believe that that came up—I believe it was firmed up that Mr. Brue would go on the board that morning, yes.

Q. And also that Nicolet would have two other designees added at a later time to the board?

A. I'm not sure that that conversation took place that morning. It may have taken place—there was a lots [sic] of discussion about the other Nicolet board members, and, in fact, I believe that Mr. Barry—excuse me, Mr. Joel Handel was involved with some of those discussions; therefore—and he didn't get there till the afternoon, so I think that that may have happened, I'm not sure.

\* \* \* \* \* \*

Q. Do you remember, Mr. Stewart, that you discussed the future makeup of the board of Nicolet, the three Nicolet members and the two nonNicolet members, at the morning meeting that took place at the offices of Weil, Gotshal?

A. Again, I'm not certain that I did it that morning, because I thought about it since and I seem to recall Mr. Handel being involved in some of those discussions.

Q. I believe you have also testified in your deposition that you had several of these discussions before anybody from Bear & Marks arrived on the scene; isn't that correct?

A. We had several discussions, that's correct. You're asking me to nail down when exactly some—

Q. We do have—

A. —some discussions occurred.

Q. We do I have [sic], though, that *at the time of the July 30 board meeting that took place,* that *there was an agreement* that the board—there would be the issuance of 2,450,000 shares of common stock and also an option for an additional 2 million shares and *that two additional representatives of Nicolet would be added to the board of directors of the corporation as soon as permitted pursuant to the Securities and Exchange Act of 1934, 1934* [sic]; *is that correct?*

MR. BLOCK: Objection to the form of the question.

THE COURT: Overruled.

A. *I believe by the time the board meeting occurred, which was late in the afternoon of the 30, that those issues had been resolved, correct.*

Q. *They had been resolved sometime before the board meeting* and *then you had your board meeting?*

A. *That's correct.*

(Tr. 1468–72) (emphasis added).

Consequently, when Brue took office on July 30, he did so pursuant to an understanding which was to result in replacement of a majority of Braintech's directors without a vote of the shareholders. Braintech's failure to file and transmit to its shareholders the required statement of information ten days before Brue took office violated § 14(f) and SEC Rule 14f–1.

■ Nicolet is clearly liable for aiding and abetting Braintech's § 14(f) violation. As a threshold matter, I note that it is undisputed that Brue was acting as Nicolet's agent, employee and designee during the events of July 29–31. I then turn to consideration of the three essential elements of aiding and abetting liability under the federal securities laws, which are:

"(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;

"(2) 'knowledge' of this violation on the part of the aider and abettor; and

"(3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."

*IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (citations omitted).

The existence of Braintech's § 14(f) violation has already been established. With regard to the second element, "knowledge" of the violation by Nicolet, the rule in this Circuit is that "where ... the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement." *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). However, in *Edwards & Hanly v. Wells Fargo Secu-*

rities Clearance Corp., 602 F.2d 478 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), the Court held that in the absence of a fiduciary relationship, "something closer to an actual intent" is required to impose aiding and abetting liability for violation of antifraud provisions of the federal securities laws.

Whether negligence or actual intent must be shown to establish Nicolet's liability depends upon whether there was a fiduciary relationship between Nicolet and Braintech's shareholders before Brue took office. For reasons stated infra in the context of Nevada law, it is not at all clear that fiduciary duties were owed by Nicolet at that time. But even if Nicolet owed no fiduciary duties at that point, I find a sufficient basis for finding that Nicolet had the more demanding actual knowledge of this § 14(f) violation by virtue of the fact that Nicolet was a party, through Brue, to the July 30 "understanding" by which Nicolet gained the right to designate a majority of Braintech's directors. Therefore, Nicolet had actual knowledge of the facts that triggered Braintech's § 14(f) disclosure obligations. And Nicolet, through Brue, clearly had actual knowledge of the § 14(f) reporting requirements since the need to make the proper disclosures before the other two Nicolet-designated directors took office was discussed at the July 30 board meeting which Brue attended. (Ex. 27 at 5).

Third, I find that Nicolet lent "substantial assistance" to Braintech's § 14(f) violation by permitting Brue to take office before the requisite disclosures were made.

It is true that it was not Nicolet's primary responsibility to make the § 14(f) disclosure; it was Braintech's. And to some extent, Nicolet's involvement in this violation may be viewed more as mere inaction than as affirmative assistance. In IIT, supra, the Second Circuit cited with approval an earlier Seventh Circuit case holding that aider and abettor liability may be imposed "in the absence of some independent duty to act only when there is clear evidence of the required degree of scienter, see Ed-

wards & Hanly, supra, 602 F.2d at 484–85, and a conscious and specific motivation for not acting on the part of an entity with a direct involvement in the transaction." 619 F.2d at 927. The Seventh Circuit case cited by the Second Circuit was Brennan v. Midwestern United Life Insurance Co., 417 F.2d 147 (1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). I have already found clear evidence of actual knowledge by Nicolet of Braintech's § 14(f) violation through Nicolet's direct involvement in negotiating the July 30 agreement giving it the right to appoint three directors to Braintech's board. The testimony of Stewart quoted supra makes it clear that the July 30 agreement reached before Brue took office involved a package deal— the framework of the July 31 letter of intent was worked out; Nicolet was to purchase a certain amount of Braintech's stock for cash; Brue was to go on the Braintech board immediately; and Nicolet was later to appoint two additional Braintech directors. Consequently, I find a conscious and specific motivation on Nicolet's part for not inducing Braintech to make the disclosures required before Brue took office in the reasonable expectation that the deal it had just negotiated with Braintech would more likely come to fruition if it installed one of its employees on the Braintech board immediately.

In sum, I find that Braintech violated § 14(f) in permitting Brue to take office without complying with the statute's requirements, and I further find that Nicolet aided and abetted that violation. In consequence, I need not consider whether Nicolet may also be liable for the violation under the alternative controlling person theory raised by Poseidon.

### (2) Section 13(d) Violation

In support of its motion for preliminary injunctive relief against Nicolet, Poseidon presses only one of its § 13(d) claims: that Nicolet failed to disclose that it lent Braintech the $750,000 paid by Braintech to Children's Hospital at the time the new license agreement between them

was executed, in return for a demand note in the amount of $750,000 with twelve percent interest. Poseidon asserts that disclosure of the note was required on the ground that the note is a "security" of Braintech. If that is so, it contends, Nicolet was required by Item 4(a) of the Special Instructions for Complying with Schedule 13D to disclose plans "for the acquisition ... of additional securities of the issuer," or by Item 6 to disclose "any contracts, agreements, understandings or relationships ... with respect to any securities of the issuer." If the acquisition of the note by Nicolet was a material event for purposes of section 13(d) disclosure, Nicolet should "promptly" have disclosed the facts relating thereto in an amended Schedule 13D.

Nicolet does not dispute that the note was a "security" within the meaning of the Exchange Act, nor that its existence should have been disclosed in an amended Schedule 13D. But it appears to suggest that there has been public disclosure concerning that $750,000 payment in Amendment No. 2 dated August 5, 1985 to Nicolet's Schedule 13D. Attached as an Exhibit to Amendment No. 2 is a copy of the letter of intent between Braintech and Nicolet dated July 31, 1985. The only portion of that document dealing with the $750,000 payment states in full:

"II. *Licensing Arrangements With Boston Childrens' Hospital*

"Promptly after the execution of this letter, Braintech will use its best efforts to secure, and will cooperate with you in its efforts to secure from Boston Childrens' Hospital ('Childrens') a new license agreement, to supersede the existing license agreement between Childrens and Braintech, dated November 30, 1981, under three patents (the 'Childrens' Patents') held by Childrens with respect to 'BEAM' technology. It is our mutual intention that such new license agreement will be a fully-paid, worldwide, exclusive license to Braintech in, to and under the Childrens' Patents, in consideration of a one-time payment by Braintech to Childrens of $750,000, to be applied by Childrens as follows:

| | |
|---|---|
| License Fee | $542,053 |
| Satisfaction of Outstanding Braintech Accounts Payable to Childrens | $207,947 |
| Total | $750,000 |

"Any and all consideration and royalties payable to Childrens with respect to such license to Braintech shall be paid by Braintech."

Conspicuous by its absence is any reference whatsoever to the fact that the $750,000 payment by Braintech to Children's Hospital was to be funded by a loan in that amount of twelve percent interest from Nicolet, evidenced by the note. There is no evidence in the record showing that any subsequent amendment to Nicolet's Schedule 13D revealed the existence of the note. This "contract ... with respect to" a security of Braintech was clearly a material event that should have been made known to Braintech's shareholders, and Nicolet's failure to disclose it constitutes a violation of § 13(d).

## IX

### *Irreparable Injury and Appropriate Remedies*

In view of the conclusions I have reached above finding merit to certain claims by each side, I must now consider whether any of those offenses give rise to irreparable injury requiring preliminary injunctive relief and if so, what form that relief should take.

#### (A) *Braintech's and Nicolet's Motion*

I have concluded that Couri and Poseidon committed violations of Nevada law, and of §§ 14(f) and 13(d) of the federal securities law.

With regard to the Nevada law claims, I have determined that the July 14 transaction leading to the issuance of 4,500,000 shares and 1,000,000 warrants for Braintech stock to Poseidon violated Nev.Rev. Stat. §§ 78.210 and 78.270, and that the transaction is voidable by Braintech. Consequently, Poseidon does not validly own those shares and warrants, and should not

be permitted to deal with them in the future as though it does.

The relief initially sought by Braintech was an order enjoining Poseidon and Couri from transferring, selling, pledging, granting options on, or otherwise disposing of those shares and warrants, to prevent their dispersal and to insure that those shares will be returned to the Braintech treasury in the event that this Court eventually orders such permanent injunctive relief. Monetary damages would be an inadequate remedy for Braintech if those shares were to be transferred by Poseidon pending final judgment in this action. The transferees are likely to be bona fide purchasers who would take clear title to the shares, and neither Couri nor Poseidon has sufficient assets to pay any damages to which Braintech would be entitled in lieu of the shares. Where a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury. *See, e.g., Trailer Train Co. v. State Board of Equalization,* 511 F.Supp. 553 (N.D.Cal. 1981), *aff'd in part, vac. in part on other grounds,* 697 F.2d 860 (9th Cir.), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) (injunctive relief granted where, due to limitation on interest rate to be paid by state defendant, monetary damages held to be "inherently inadequate because the defendant would not be required to fully respond in damages"); *Teamsters Freight Local Union No. 480 v. Southern Forwarding Co.,* 424 F.Supp. 11, 13 and n. 13 (M.D.Tenn.1976) ("Insolvency of a defendant has been recognized as a proper ground for granting injunctive relief").

I am not persuaded by counsel's argument that no imminent threat of injury exists merely because Couri has "no present intention" of transferring Poseidon's Braintech stock and is willing to give Braintech fifteen (15) days' notice, if he changes his mind and decides to do so, in order that Braintech might then apply for injunctive relief. On at least two occasions, Couri has granted options on or pledged Poseidon's Braintech stock. His reluctance to stipulate not to transfer any stock pending final judgment in this action makes me doubtful that his "present intention" not to transfer will long endure, and I see no point in expending more judicial resources later in order to give Braintech the protection from irreparable injury I find it is entitled to now.

Nor do I find persuasive Poseidon's 11th-hour argument that Nev.Rev.Stat. § 78.220 provides Braintech with an adequate remedy at law by placing a statutory lien in Braintech's favor on those shares. The plain language of the statute does not so provide. For purposes of this analysis, I assume but do not decide that a "subscription contract" within the meaning of that statutory provision was created by the July 14 Braintech board resolution authorizing issuance of those shares and warrants in return for Poseidon's past services rendered and Poseidon's promissory note. If so, the statute provides only that if a purchaser defaults in payment of installments or calls due under such a subscription contract,

> "the corporation may proceed to collect the amount due in the same manner as any debt due the corporation. In addition, the corporation may sell a sufficient number of the subscriber's shares at public auction to pay for the installment or call and any incidental charges incurred as a result of the sale."

Nothing in the statute suggests an intention by the Nevada legislature to create a right of recovery enforceable even against a third-party bona fide purchaser. On the contrary, the statutory language permits only sale of "the *subscriber's* shares." Poseidon cites no judicial authority suggesting the statute should be read more broadly; in fact, the Court has been unable to find any case law construing Nev.Rev.Stat. § 78.220. Therefore, I am not convinced that that statutory provision safely shields Braintech from the irreparable injury I find

it is likely to suffer in the absence of preliminary injunctive relief.

Poseidon, the purported owner of 4.5 million shares that were unlawfully issued, is Braintech's second largest shareholder. Therefore, if Poseidon is permitted to vote those shares in the future, the legitimate voting power of all other Braintech shareholders will be substantially and unfairly diluted. In these circumstances, it is appropriate that preliminary injunctive relief on the state law claims include an order enjoining Poseidon from voting those shares at any Braintech shareholder meeting prior to the entry of final judgment in this action.

In marked contrast to their state law claims, Braintech and Nicolet have failed to prove the existence of irreparable injury flowing from Couri's and Poseidon's violations of the federal securities law.

The § 14(f) violation enabled Poseidon to gain exclusive control of Braintech's board of directors and legal ownership of the 4.5 million shares and 1 million warrants without providing Braintech's shareholders the information required by that section and time to absorb it before the shift in corporate control occurred. But Poseidon is no longer in control of Braintech. Any harm done to the corporation or other Braintech shareholders through Poseidon's acquisition of the shares and warrants while in control is already remedied through the injunctive relief I have granted *supra,* sterilizing and freezing those shares. An order enjoining Poseidon's right to vote or transfer its remaining 600,000 shares of Braintech stock, lawfully acquired before Poseidon took control of the company, until § 14(f) disclosure is made would not further the goals of the 1934 Act because Poseidon is no longer in a position to exercise control over Braintech. Braintech's and Nicolet's irreparable injury claim on this point is further undercut by the fact that Couri and Poseidon did file Schedule

13Ds which contain much of the same information concerning, *inter alia,* their identity, background and plans for Braintech, required by the § 14(f) statement of information. In sum, Braintech and Nicolet have failed to demonstrate any irreparable injury resulting from that § 14(f) violation that requires broader preliminary injunctive relief than that which I have already granted for the Nevada law violations.

The same is true for the § 13(d) violations. Couri's initial failure timely to file a Schedule 13D in his individual capacity as controlling person of Poseidon was cured by the filing of such a document on June 24. It is well-settled that once the informative purpose of § 13(d) has been fulfilled by curative disclosure, there is no risk of irreparable injury to shareholders and no basis for injunctive relief. *See, e.g., Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980); *Standard Metals Corp. v. Tomlin,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,894 at 90,512, 90,513–14 (S.D.N.Y. 1981).[3]

Although no curative disclosure of Couri's and Poseidon's second § 13(d) violation has yet been made, no irreparable harm can now be said to flow from that violation for two reasons. First, the disclosure involved in that violation related only to Poseidon's decision not to vote its shares in favor of the Braintech/Nicolet transaction contemplated by the June 26 letter of intent. That agreement is now a dead letter and has been superseded by the July 31 agreement. Poseidon's support or lack of support for the June 26 version of the transaction is thus irrelevant. Second, the preliminary injunctive relief I have already granted, sterilizing all but 600,000 of Poseidon's Braintech shares, renders nugatory

---

**3.** In *Treadway,* the court expressly left open the question whether injunctive relief may be appropriate "where a defendant obtains 'a degree of effective control' as a result of purchases made before it has complied with § 13(d)...."

But that question does not arise in this case because Couri and Poseidon did not obtain a degree of effective control through their purchases of Braintech stock until after Couri had filed his individual Schedule 13D.

its failure to disclose whatever present intention it may have not to vote in favor of a Braintech/Nicolet transaction.

**(B)** *Poseidon's and Drobbin's Motions*

 I have concluded that Braintech committed one violation of § 14(f) of the federal securities laws, and that Nicolet aided and abetted that violation. I have also concluded that Nicolet committed an additional violation of § 13(d).

With regard to the § 14(f) violation, I find that no preliminary injunctive relief is required or appropriate because Poseidon has failed to show that Braintech's shareholders will suffer irreparable injury in the absence of such relief. Braintech did file the statement of information required by § 14(f) on August 29, before Nicolet employees Robert Penrod and Russell B. Cichy took their seats as directors of Braintech. All of the information which I would now order Braintech to disclose in order to remedy the July 31 failure to file has already been disclosed in the August 29 filing. To that extent there has been curative disclosure.

Although Poseidon tacitly concedes that any further order of disclosure would be a meaningless exercise, it protests that alternative injunctive relief—in particular an order sterilizing Nicolet's shares so that they may not be voted at the annual Braintech shareholder meeting—is appropriate here because, the argument goes, Nicolet unfairly used the period Braintech was not in compliance with the requirements of § 14(f) to seize effective control of the company through the stock option and stock purchase agreements. See *Financial General Bankshares, Inc. v. Lance,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,418, 93,427–28 (in dictum, order enjoining tender offer might be appropriate where defendants obtain effective control of corporation as a result of purchases made while not in compliance with requirements of § 13(d) ). *See also* n. 3 *infra.* Assuming without deciding that sterilization is an appropriate remedy where effective control of a company is

unfairly gained during a period when § 14(f) disclosure was required but not made, I see no basis for awarding such relief here. I have found that all of the challenged transactions engaged in by Nicolet and Braintech between July 30, when the § 14(f) disclosure obligation arose, and August 29, when disclosure was finally made, were fair to Braintech and its shareholders at that time. Thus no Braintech shareholder may claim to have been irreparably injured by anything that occurred during that period of time. Any shareholder wishing to claim that he or she would have sold Braintech stock earlier if apprised on July 30 of the imminent shift in corporate control has an adequate remedy at law for any injury sustained thereby in the form of money damages.

Nicolet's § 13(d) violation is another matter. In order to insure that before voting on the proposed asset purchase agreement Braintech's shareholders are fully and fairly informed of the facts relating to the $750,000 demand note, I enjoin Nicolet from voting any of its shares at the shareholder meeting until ten (10) days after the relevant information has been disclosed in an amendment to Nicolet's Schedule 13D.

Except as specifically granted herein, the cross motions for preliminary injunctions are denied.

*Conclusion*

Counsel for Braintech and Nicolet are directed to settle an order of preliminary injunctive relief, consistent with this opinion, on five (5) days' notice.

It is SO ORDERED.